## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| | : | |
| NATIONAL WASTE & RECYCLING ASSOCIATION | : | |
| | : | |
| *Petitioner,* | : | |
| | : | |
| *v.* | : | Case No. 24-1321 |
| | : | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE M. ZELDIN, in his official Capacity as Administrator, United States Environmental Protection Agency, | : | |
| | : | |
| *Respondents.* | : | |

---

## PETITIONER'S RESPONSE TO SHOW CAUSE ORDER

Petitioner National Waste & Recycling Association ("NWRA") hereby responds to the Court's show cause order of July 17, 2024. For the reasons stated below, NWRA opposes consolidation of the present Case No. 24-1321 with Case No. 24-1216 and further opposes any abeyance of Case No. 24-1321.[1] The present case is a procedural and substantive challenge to the Environmental Protection

---

[1] Counsel for the parties met and conferred regarding the Court's show cause order on August 18, 2025. Based on that meeting, it is our understanding that EPA similarly opposes consolidation of the two cases, but the Agency intends to request that the present case be put in abeyance. Consistent with our opposition to the Court's suggested abeyance, NWRA opposes EPA's request to place the present case in abeyance for the all the reasons stated in this response.

Agency's ("EPA's") finalization of changes to its emission factors for municipal solid waste ("MSW") landfills set forth in Chapter 2.4 of the AP-42 Compilation of Air Emission Factors from Stationary Sources ("AP-42"). Case No. 24-1216 deals with an entirely different rule—the Greenhouse Gas Reporting Rule promulgated at 40 C.F.R. Part 98. While the present case and Case No. 24-1216 address the technical and procedural sufficiency of EPA's collection efficiency values for gas collection and control systems at MSW landfills, the current legal effect of these separately challenged EPA actions are entirely different and therefore warrant separate treatment by this Court.[2]

## BACKGROUND

The instant case is a challenge to EPA's final updates to Section 2.4 of the AP-42 Compilation of Air Emissions Factors from Stationary Sources applicable to MSW landfills ("Final AP-42 Revision"). *See Final Emissions Factors for AP-42 Chapter 2, Section 4 - Municipal Solid Waste Landfills*, U.S. EPA (Aug. 15, 2024), https://www.epa.gov/air-emissions-factors-and-quantification/final-emissions-factors-ap-42-chapter-2-section-4. Unlike other source categories, MSW landfills are uniquely affected by AP-42 in permitting and compliance matters. Thus, the

---

[2] If the Court concludes that the present case should nevertheless be consolidated with Case No. 24-1216 based on the commonality of issues, NWRA intends to move to lift the abeyance in order to address the immediate and ongoing legal consequences of EPA's final updates to Section 2.4 of AP-42.

Final AP-42 Revision has had an immediate effect on MSW landfills, and Petitioner has an immediate interest in addressing this action separately before the Court. Whereas Petitioner likewise has a keen interest in pursuing its challenge to the Greenhouse Gas Reporting Rule in Case No. 24-1216, that challenge is situated differently. The relationship between the two pending challenges is explained below.

On April 25, 2024, EPA finalized changes to the collection efficiency values that landfills must utilize when reporting emissions under subpart HH, Table HH-3 of the Greenhouse Gas Reporting Program ("GHGRP"). *See Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, 89 Fed. Reg. 31802 (Apr. 25, 2024) ("Final GHGRP Rule"). EPA finalized across-the-board reductions in collection efficiency values to be used for GHG quantification and reporting purposes, which has the effect of artificially increasing emission estimates for required reporters. As finalized, MSW landfills operating gas collection and control systems cannot estimate emissions under Equations HH-7 and HH-8 of the GHGRP using a collection efficiency greater than 85 percent, even where the collection efficiency is, in reality, greater than 85

percent. The new collection efficiency values became effective January 1, 2025, and reporting using the new values is first due in March of 2026.

NWRA initiated administrative and judicial challenges to the Final GHGRP Rule because the finalized collection efficiency values (1) were promulgated without sufficient notice and opportunity to comment as required by Clean Air Act procedural requirements, and (2) are substantively wrong, technically deficient, and in contravention of the goals articulated by the GHGRP. NWRA filed its Petition for Reconsideration with EPA on June 21, 2024. NWRA's Petition for Review was filed with the Court on June 24, 2024, and assigned Case No. 24-1216 (the "GHGRP challenge"). EPA granted NWRA's Petition for Reconsideration on August 8, 2024. In light of EPA's reconsideration of the collection efficiency values, the parties jointly moved to hold the GHGRP challenge in abeyance pending the outcome of the reconsideration proceedings, which the Court granted on September 4, 2024.

On August 15, 2024, just seven days after granting reconsideration of the GHGRP Final Rule, EPA inexplicably doubled down on the deficient collection efficiency values by incorporating them into the Agency's Final AP-42 Revision. Once again, EPA failed to give any indication in its draft AP-42 revisions that it was considering dramatic changes to the collection efficiency values for gas collection and control systems. Instead, the draft AP-42 revisions published for

public comment proposed no changes to collection efficiency values at all. Without any notice of the final collection efficiency values, landfill owners and operators were prevented from commenting on the changed collection efficiency values. By incorporating the GHGRP's reduced collection efficiencies into the Final AP-42 Revisions, EPA effectively converted improperly promulgated *reporting* requirements into immediately effective and similarly deficient *compliance* and *permitting* requirements.

Given the immediate legal consequences to its members, NWRA initiated separate administrative and judicial challenges to EPA's Final AP-42 Revisions. NWRA filed a Petition for Reconsideration with EPA on October 14, 2024.[3] EPA acknowledged receipt of the Petition on October 30, 2024. NWRA filed its Petition for Review in the present case on October 14, 2024 (the "AP-42 challenge"). After conferring with counsel for EPA about the Court's show cause order, we understand that the Agency intends to grant NWRA's petition for reconsideration in the coming days.

## ARGUMENT

Fundamental differences in the legal effect of EPA's GHGRP Rule and its Final AP-42 Revision warrant this Court moving forward with NWRA's AP-42 challenge. NWRA agreed to an abeyance of its GHGRP challenge because EPA

---

[3] *See* NWRA's Petition for Reconsideration attached hereto at Exhibit 1.

had granted reconsideration *and* there was sufficient time for the Agency to address the deficient collection efficiency values before landfills must begin emissions reporting with those deficient values by March 31, 2026. *See* 89 Fed. Reg. at 31806. That is not the case for EPA's Final AP-42 Revisions. As detailed below, EPA's issuance of the Final AP-42 Revisions had immediate effects on the permitting and compliance requirements of MSW landfills subject to regulation under the Clean Air Act. At this point, there are only two ways to remedy EPA's substantively and procedurally deficient update to AP-42: 1) this Court addresses the merits of NWRA's Petition for Review; or 2) EPA rescinds the Final AP-42 Revisions. EPA's planned reconsideration of the Final AP-42 Revisions will do nothing to alleviate the ongoing permitting and compliance impacts of the updated collection efficiency values and instead would only indefinitely delay a resolution of the substantive and procedural deficiencies in the Final AP-42 Revisions.

## I. AP-42 Emission Factors Have Unique Legal Effect on Landfill Sector

Unlike other industrial sectors, the specific statutes and regulations that govern MSW landfills presume or require use of AP-42 for the estimation of emissions. Specifically, both the New Source Performance Standards ("NSPS") and the National Emission Standards for Hazardous Pollutants ("NESHAP") cite to AP-42 emission factors and direct MSW landfills to use those factors and methodologies when calculating emissions for permitting and compliance

purposes. By way of example, the Standard of Performance for MSW landfills contained in subpart XXX provides:

> When calculating emissions for Prevention of Significant Deterioration purposes, the owner or operator of *each MSW landfill subject to the provisions of this subpart must estimate the NMOC emission rate* for comparison to the Prevention of Significant Deterioration major source and significance levels in §§ 51.166 or 52.21 of this chapter *using Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources (AP-42)* or other approved measurement procedures.

40 C.F.R. § 60.764(c) (emphasis added).[4] While the above-referenced provision stipulates that "other site-specific values demonstrated to be appropriate and approved by the Administrator" are acceptable alternatives to the use of AP-42, EPA is keenly aware that there is no generally accepted industry standard for the establishment of a "site-specific" collection efficiency value based on a comprehensive methane surface sampling program. Thus, in reality, states rely on AP-42 for compliance purposes.

This reality is reinforced by the fact that MSW landfill emissions cannot be tested or quantified in the same way as most other emission sources covered by AP-42. While EPA generally states that AP-42 factors for source categories should

---

[4] Additional provisions include 40 C.F.R. § 60.765(a)(1); 40 C.F.R. § 60.35f(c); 40 C.F.R. § 60.36f(a)(1); 40 C.F.R. § 62.16718(c); 40 C.F.R. § 62.16720(a)(1); and 40 C.F.R. § 63.1960(a)(1).

not be used in permitting actions, and instead recommends emission factors as a last resort to other methodologies such as Continuous Emission Monitoring Systems ("CEMS"), stack testing, vendor guarantees and stack test data from similar facilities, material balance calculations, and optical remote sensing, these options are not available for MSW landfills. EPA is again keenly aware that none of these methodologies exist for the quantification of fugitive landfill gas emissions. With no other options, states and permitting authorities are left to rely on AP-42 emission factors when reviewing landfill applications.

These legal effects are not theoretical. NWRA members have been subjected to states' required use of AP-42, both in initial permitting actions for purposes of estimating VOC and/or methane emissions, and in ongoing demonstrations of compliance.

- At one Pennsylvania landfill, a recently issued MSW landfill expansion permit directs that the permittee "shall calculate and record the monthly and 12-month rolling average VOC emissions from the… Landfill, using Department approved methods and the latest edition of AP-42 Chapter 2.4."[5]

- In Colorado, the Department of Public Health and Environment has issued guidance relating to the disposal of petroleum contaminated soils that relies

---

[5] *See* Relevant Excerpt from Pennsylvania MSW Landfill Operating Permit, included as Attachment D in Exhibit 1.

on AP-42 co-disposal factors for emission estimation. Moreover, the Department routinely includes the AP-42 Section 2.4 emission factor in the compliance provisions of MSW landfill operating permits. Specifically, the Department lists AP-42 Section 2.4 as the "Compliance Emission Factor" applicable to fugitive (or "uncollected") emission limits of, for example, VOC, CO, and HAPs.[6]

- In South Carolina, limitation, monitoring, and reporting permit conditions directly reference the collection efficiency values contained within AP-42.[7]

- Similarly, in Arizona, the Department of Environmental Quality incorporates the "site specific values demonstrated to be appropriate" from AP-42 for the purposes of calculating the maximum expected gas generation flow rate.[8]

While the GHGRP Rule is a reporting rule only, the required use of AP-42 in permits as described above has real consequences for MSW landfills. The Final AP-42 Revision now requires MSW landfills to estimate emissions using procedurally and technically flawed values, which may cause landfills to trigger heightened standards, or at a minimum force them to make regulatory determinations on that basis. Further, the new collection efficiency values for

---

[6] *See* Relevant Excerpts from Colorado MSW Landfill Operating Permits, included as Attachment E in Exhibit 1.
[7] *See* Relevant Excerpt from South Carolina MSW Landfill Operating Permit, including as Attachment F in Exhibit 1.
[8] *See* Relevant Excerpt from Arizona MSW Landfill Operating Permit, included as Attachment G in Exhibit 1.

various operating conditions effectively cap collection efficiency at 85 percent for even the most well-performing landfill areas equipped with a gas collection and control system and three feet of soil or clay for final cover. For active areas with a gas collection and control system and daily cover, the revised Table HH-3 would allow for only 50 percent collection efficiency, despite the fact that many operating landfills would achieve much higher collection efficiencies.

## II. EPA's Reconsideration of the Greenhouse Gas Reporting Program Does Not Support Consolidation of the GHGRP Challenge and the AP-42 Challenge

As of this date, EPA has not acted on its agreed-upon reconsideration of the Final GHGRP Rule. Further, EPA's announced intention to reconsider the entire GHGRP does little to change NWRA's need for resolution of its challenge to the Final AP-42 Revision, which was an entirely separate action. As of this submission, EPA has not yet published a proposal to rescind much or all of the GHGRP. Once proposed, EPA will have to complete the notice and comment rulemaking process. And if EPA finalizes a recission of the GHGRP, a lengthy legal challenge will ensue. All the while, NWRA members will continue to face permitting and compliance decisions based on the substantively and procedurally deficient collection efficiency values contained in the Final AP-42 Revision.

# CONCLUSION

For the foregoing reasons, good cause exists to keep the current case (No.
24-1321) separate from Case No. 24-1216. Petitioner respectfully requests that the
show cause order be discharged and the case proceed to briefing on the merits.

Dated: August 18, 2025

Respectfully submitted,

/s/ *Matthew W. Morrison*
Matthew W. Morrison,
D.C. Circuit No. 60215
Mark C. Talty
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Phone: 202-663-8000
Fax: 202-663-8007
matthew.morrison@pillsburylaw.com
mark.talty@pillsburylaw.com

Carol F. McCabe, D.C. Circuit No. 45910
Kelly A. Hanna, D.C. Circuit No. 65368
MANKO, GOLD, KATCHER & FOX LLP
Three Bala Plaza East
Suite 700
Bala Cynwyd, PA 19004
Phone: 484-430-2304
Fax: 484-430-5711
cmccabe@mankogold.com
khanna@mankogold.com

*Counsel for Petitioner National Waste &
Recycling Association*

## CERTIFICATE OF COMPLIANCE

This response complies with (1) the type-volume limitation Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains words 2,113 words, excluding excluding the parts exempted by Rule 27(a)(2)(B); and (2) the type-face and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used for the word count).


Dated: August 18, 2025         Respectfully submitted,

/s/ *Matthew W. Morrison*
Matthew W. Morrison

*Counsel for Petitioner National Waste & Recycling Association*

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25, I hereby certify that a copy of the foregoing document was electronically filed on August 18, 2025 with the Clerk of Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the CM/ECF system.


Dated: August 18, 2025

Respectfully submitted,

/s/ *Matthew W. Morrison*
Matthew W. Morrison

*Counsel for Petitioner National Waste & Recycling Association*


Exhibit 1



October 14, 2024

*Via U.S. and Electronic Mail*

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, D.C. 20460
Regan.Michael@epa.gov

Gautam Srinivasan
Associate General Counsel
U.S. Environmental Protection Agency
Air and Radiation Law Office
1200 Pennsylvania Avenue NW
Washington, D.C. 20460
Srinivasan.Gautam@epa.gov

Re:     **Petition for Reconsideration of AP-42: Compilation of Air Emissions Factors from Stationary Sources, Section 2.4 (Municipal Solid Waste Landfills)**

Dear Administrator Regan and Associate General Counsel Srinivasan:

Enclosed please find attached a Petition for Reconsideration submitted by the National Waste & Recycling Association (NWRA) with respect to the Final Revisions of AP-42: Compilation of Air Emissions Factors from Stationary Sources. NWRA's Petition for Reconsideration is limited to Chapter 2, Section 4, which is applicable to Municipal Solid Waste Landfills, and EPA's determination therein to incorporate by reference the landfill gas collection efficiency values from the finalized version of Subpart HH of the Greenhouse Gas Reporting Program, *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, 89 Fed. Reg. 31802 (Apr. 25, 2024) ("Final GHGRP Rule").

NWRA appreciates EPA's consideration of this Petition and hopes to work cooperatively with EPA toward improvements in the accuracy of landfill sector emissions reporting. Please feel free to contact the undersigned at agermain@wasterecycling.org, or outside counsel for NWRA, Carol McCabe at cmccabe@mankogold.com or Matt Morrison at matthew.morrison@pillsburylaw.com, with any questions you may have.

Respectfully submitted,

Anne Germain
Chief Operating Officer and Senior Vice President
of Technical and Regulatory Affairs
National Waste & Recycling Association

Enclosure

cc:    Peter Tsirigotis, Director, Office of Air Quality Planning and Standards (via U.S. and electronic mail)
        Barrett Parker, Office of Air Quality Planning and Standards (via U.S. and electronic mail)
        Mark Turner, Office of Air Quality Planning and Standards (via U.S. and electronic mail)
        Patrick Lessard, Air Quality Policy Division (via U.S. and electronic mail)
        Julius Banks, EPA Greenhouse Gas Reporting Branch (via electronic mail)
        Carol F. McCabe, Manko, Gold, Katcher & Fox (via electronic mail)
        Kelly A. Hanna, Manko, Gold, Katcher & Fox (via electronic mail)
        Matthew W. Morrison, Pillsbury Winthrop Shaw Pittman (via electronic mail)

2915468_6

**The National Waste & Recycling Association's**
**Petition for Reconsideration of AP-42: Compilation of Air**
**Emissions Factors from Stationary Sources**
*Section 2.4 - Municipal Solid Waste Landfills*
**(August 15, 2024)**

3

# Table of Contents

I.  INTRODUCTION ...................................................................................................... 5

II. BACKGROUND ...................................................................................................... 11

    A.   History of AP-42 .............................................................................................. 11

    B.   2024 Draft Revisions to AP-42 Section 2.4 ................................................... 13

    C.   The Finalized Version of AP-42 as of August 15, 2024 ................................ 14

III. EPA's updates to Chapter 2, Section 4 of AP-42 constitute a "final action" subject to review and reconsideration under Section 307 of the Clean Air Act. ......................................... 16

IV. Requested Grounds for Reconsideration ............................................................... 19

    A.   EPA did not afford interested parties with adequate notice of the incorporation of Subpart HH collection efficiency values into AP-42; therefore the Final AP-42 Revision is not the "logical outgrowth" of the 2024 Draft AP-42 Revisions. ....................................... 20

    B.   The incorporation of Subpart HH collection efficiency values should be reconsidered because NWRA's objections are of "central relevance to the outcome of" AP-42, Chapter 2, Section 4 ...................................................................................................... 23

    C.   The collection efficiency values from Table HH-3 of the GHGRP are technically deficient and their incorporation into AP-42 is therefore arbitrary and capricious. ............ 29

    D.   EPA acted without "observance of procedure required by law" required for rulemaking under the Clean Air Act. .................................................................................. 33

V.  Request for Administrative Stay ........................................................................... 33

VI. Request for Alternative Relief .............................................................................. 34

VII. Conclusion ............................................................................................................ 35

2915468_6

## PETITION FOR RECONSIDERATION, STAY, OR ALTERNATIVE RELIEF WITH RESPECT TO AP-42 CHAPTER 2, SECTION 4

## I.  INTRODUCTION

Petitioner is the National Waste & Recycling Association ("NWRA" or "the Petitioner"). NWRA is the leading voice of the North American waste and recycling industry on advocacy, education, and safety. The industry provides essential services that benefit our local communities and businesses by assisting our customers in achieving their environmental and sustainability aspirations. NWRA supports and promotes regulatory advancements and policies that benefit the solid waste industry and improve the quality of life for all Americans. NWRA members operate in all 50 states, the District of Columbia, and can be found in most, if not all, U.S. congressional districts. Waste and recycling facilities number nearly 18,000 scattered throughout the U.S., mirroring population centers. NWRA's nearly 700 members are a mix of publicly traded and privately owned local, regional and Fortune 500 national and international companies. NWRA represents approximately 70 percent of the private sector waste and recycling market. Many of NWRA's members own and operate municipal solid waste ("MSW") landfills that are regulated under the Clean Air Act and parallel state programs.

On August 15, 2024, the United States Environmental Protection Agency ("EPA") finalized updates to Section 2.4 of the AP-42 Compilation of Air Emissions Factors from Stationary Sources ("AP-42") applicable to MSW landfills ("Final AP-42 Revision").[1] EPA published these updates as part of a settlement agreement to litigation, wherein organizational plaintiffs alleged that EPA was impermissibly dodging its non-discretionary duties set forth

---

[1] *See Final Emissions Factors for AP-42 Chapter 2, Section 4 - Municipal Solid Waste Landfills*, U.S. EPA (Aug. 15, 2024), https://www.epa.gov/air-emissions-factors-and-quantification/final-emissions-factors-ap-42-chapter-2-section-4; *see also Email Notification from Chief_Info@epa.gov, "[EXTERNAL] [chief] Final Emission Factors for AP-42 Chapter 2, Section 4 - Municipal Solid Waste Landfills"* (Aug. 15, 2024), attached hereto as Attachment A.

2915468_6

under Section 130 of the Clean Air Act, 42 U.S.C. § 7430, to review and if necessary, revise, the emission factors set forth in AP-42 Section 2.4, as applicable to MSW landfills, every three years. *See Envt'l Integrity Proj. v. Michael Regan*, No. 1:22-cv-02243 (D.D.C. July 29, 2022). As a result of settlement negotiations, EPA published a proposed consent decree in the Federal Register, outlining a timeline in which EPA would publish draft and final revisions to AP-42 Section 2.4.[2] EPA abided by the agreed upon timeline, publishing draft revisions on January 12, 2024 ("2024 Draft AP-42 Revisions"), accepting comments through March 12, 2024, and publishing the Final AP-42 Revision on August 15, 2024.

The 2024 Draft AP-42 Revisions contained a number of proposed revisions to AP-42 Section 2.4, and Petitioner submitted comments on these proposed changes via comment letter submitted on March 12, 2024. However, Petitioner had no advance notice or opportunity to comment on the significant change to the MSW landfill collection efficiency values for gas collection and control systems ("GCCS") that EPA implemented under Section 2.4. Instead, the 2024 Draft AP-42 Revisions that were released for public comment largely mimicked the previous drafts of Section 2.4 with respect to collection efficiency, which has always been recognized in AP-42 and elsewhere as an essential tool in estimating controlled emissions of $CH_4$, NMOC, and other constituents in landfill gas from landfills utilizing GCCS. Specifically, the 2024 Draft AP-42 Revisions articulated a range of collection efficiencies from 50 to 85% based on the efficiencies typically reported, with a default efficiency of 75% recommended by EPA for inventory purposes. The use of a reported collection efficiency range and assumed average has been an established feature of Section 2.4[3]—the 2024 Draft AP-42 Revisions,

---

[2] *See Proposed Consent Decree, Clean Air Act Citizen Suit*, 88 Fed. Reg. 8425 (Feb. 9, 2023).
[3] The 2008 draft version of AP-42, which was informative but never formally finalized, articulated a collection efficiency range of 50 to 95%, with 75% most commonly assumed. *See* AP-42 2008 Draft, § 2.4.4.2, at 2.4–8. The 1998 version, which remained effective until the Final AP-42 Revision was published, articulated a collection

6

therefore, did not impose any unexpected changes or obligations on MSW landfills with respect to collection efficiency.

This Petition addresses EPA's decision in the Final AP-42 Revision to stray from the use of a collection efficiency range and default average and instead incorporate directly by reference into AP-42 the newly established collection efficiency values from the recently finalized version of Subpart HH, Table HH-3 of the Greenhouse Gas Reporting Program ("GHGRP"), which will be effective January 1, 2025 under title 40, part 98, subpart HH of the Code of Federal Regulations. *See Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, 89 Fed. Reg. 31802 (Apr. 25, 2024) ("Final GHGRP Rule"). Table HH-3, as finalized in the Final GHGRP Rule, is shown below.

TABLE HH–3 TO SUBPART HH OF PART 98—LANDFILL GAS COLLECTION EFFICIENCIES

| Description | Term ID | Landfill gas collection efficiency |
|---|---|---|
| A1: Area with no waste in-place | | Not applicable; do not use this area in the calculation. |
| A2: Area without active gas collection, regardless of cover type | CE2 | 0%. |
| A3: Area with daily soil cover and active gas collection | CE3 | 50%. |
| A4: Area with an intermediate soil cover, or a final soil cover not meeting the criteria for A5 below, and active gas collection. | CE4 | 65%. |
| A5: Area with a final soil cover of 3 feet or thicker of clay or final cover (as approved by the relevant agency) and/or geomembrane cover system and active gas collection. | CE5 | 85%. |
| Area weighted average collection efficiency for landfills | CEave1 = (A2*CE2 + A3*CE3 + A4*CE4 + A5*CE5)/(A2 + A3 + A4 + A5). | |

These new collection efficiency values were set forth in Subpart HH of the Final GHGRP Rule after a series of proposals in which EPA had articulated its intent to establish 10% reduced collection efficiency values for landfill sources that do not conduct surface methane emissions

---

efficiency range of 60 to 85%, with an average of 75% most commonly assumed. *See* AP-42 (Nov. 1998), § 2.4.4.2, at 2.4–6.

2915468_6

monitoring ("SEM") pursuant to governing federal landfill rules.[4] Table HH-3, as proposed by EPA in its 2023 Supplemental GHGRP Proposal is shown below:

TABLE HH-3 TO SUBPART HH OF PART 98—LANDFILL GAS COLLECTION EFFICIENCIES

| Description | Term ID | Landfills for which surface methane concentration measurements[1] are conducted (%) | Landfills for which no surface methane concentration measurements[1] are conducted (%) |
|---|---|---|---|
| A1: Area with no waste in-place | Not applicable; do not use this area in the calculation. | | |
| A2: Area without active gas collection, regardless of cover type | CE2 | 0 | 0 |
| A3: Area with daily soil cover and active gas collection | CE3 | 60 | 50 |
| A4: Area with an intermediate soil cover, or a final soil cover not meeting the criteria for A5 below, and active gas collection. | CE4 | 75 | 65 |
| A5: Area with a final soil cover of 3 feet or thicker of clay or final cover (as approved by the relevant agency) and/or geomembrane cover system and active gas collection. | CE5 | 95 | 85 |
| Area weighted average collection efficiency for landfills | CEave1 = (A2*CE2 + A3*CE3 + A4*CE4 + A5*CE5)/(A2 + A3 + A4 + A5). | | |

[1] Surface methane concentration measurements include only those conducted as required under 40 CFR part 60, subparts WWW or XXX, or approved state plans to implement the emission guidelines in 40 CFR part 60, subparts Cc or Cf, or Federal plan at 40 CFR part 62 subparts GGG or OOO, or, for those electing to conduct surface concentration measurements, those conducted according to the method provided in § 98.344(g) of this subpart.

As evidenced by the Tables above, EPA established in the Final GHGRP Rule across-the-board reductions in collection efficiency values to be used for GHG quantification and reporting purposes. Contrary to the 2023 Supplemental GHGRP Proposal, the finalized collection efficiency reductions in Table HH-3 were not related to SEM practices.[5] Thus, as finalized under

---

[4] *See* (1) the Data Quality Improvements Proposal, 87 Fed. Reg. 36920 (June 21, 2022), and (2) the 2023 Supplemental GHGRP Proposal, 88 Fed. Reg. 32852 (May 22, 2023).

[5] In its 2023 Supplemental GHGRP Proposal, EPA made two proposals tying collection efficiency to SEM. First, EPA proposed to amended Equations HH-6, HH-7, and HH-8 to include a "correction term" that accounted for surface exceedances of methane. 2023 Supplemental Proposal, 88 Fed. Reg., at 32878. EPA concluded, after the period for public comment, that there was significant variability in measured surface concentrations and methane emissions flux across different landfills; and due to the "high uncertainty," EPA decided it would reassess the appropriateness of the correction term. Final GHGRP Rule, 89 Fed. Reg., at 31855. Second, EPA proposed to reduce the collection efficiency values in Table HH-3, as applicable to non-regulated reporting MSW landfills by 10%, on the basis that they are not required to conduct SEM. 2023 Supplemental GHGRP Proposal, 88 Fed. Reg., at 32932. In removing the proposed correction term, EPA decided to reduce collection efficiency values in Table HH-3, as applied to *all* reporting MSW landfills because it believed the studies showed "current collection efficiencies are overstated on average by 10-percentage points or more." Final GHGRP Rule, 89 Fed. Reg., at 31856 (citing Duan, Z., et al., *Efficiency of gas collection systems at Danish landfills and implications for regulations*, 139 WASTE MANAGEMENT 269–78 (2022), https://doi.org/10.1016/j.wasman.2021.12.023.; Nesser, H., et al., *High-resolution U.S. methane emissions inferred from an inversion of 2019 TROPOMI satellite data: contributions from individual*

2915468_6

the Final GHGRP Rule, MSW landfills operating GCCS cannot estimate emissions under Equations HH-7 and HH-8 of the GHGRP using a collection efficiency greater than 85%, even where collection efficiency is, in reality, greater than 85%. EPA's purported basis for the reduced collection efficiency values was its belief that reported emissions under the GHGRP are lower than actual emissions. Petitioner disagrees with this rationale, which was based entirely on a handful of recent academic and advocacy papers that undertake to examine mass methane emission estimates based on satellite or aerial images of methane releases from landfills.

Petitioner initiated administrative and judicial challenges to the Final GHGRP Rule because the finalized collection efficiency values (1) were promulgated without adherence to Clean Air Act procedural requirements, and (2) are substantively wrong, technically deficient, and in contravention of the goals articulated by the GHGRP.[6] In short, Petitioner believes that the academic and advocacy papers on which EPA based its determination are not scientifically sound because they purport to extrapolate long-term emission rates across a broad industry sector using only a handful of remote measurements that lack the necessary characteristics, data integrity, and completeness for such assumptions across an extremely diverse set of sites and operating conditions. EPA granted NWRA's Petition for Reconsideration on August 8, 2024 and proceedings are ongoing.[7]

EPA's incorporation by reference of the GHGRP Rule collection efficiency values into the Final AP-42 Revision is particularly harmful to MSW landfills, as set forth at length herein

---

*states, urban areas, and landfills*, EGUSPHERE [preprint] (2023), https://doi.org/10.5194/egusphere-2023-946; and supplement https://egusphere.copernicus.org/preprints/2023/egusphere-2023-946/egusphere-2023-946-supplement.pdf.)

[6] Petitioner's Petition for Reconsideration of Subpart HH of the Final GHGRP Rule is attached hereto as "Attachment B." Petitioners filed a parallel petition for judicial review in the United States Court of Appeals for the District of Columbia. *See Nat'l Waste & Recycling Assoc. v. EPA*, Case No. 24-1216 (D.C. Cir.). On September 4, the Court granted the parties' joint motion to hold Case No. 24-1216 in abeyance pending the outcome of the reconsideration proceedings.

[7] *See* Letter from EPA Granting Reconsideration, attached hereto as "Attachment C."

2915468_6

for, *inter alia*, the following reasons: (1) unlike in other industry sectors, MSW landfills are effectively required to utilize certain aspects of AP-42 pursuant to categorical rules governing MSW landfills promulgated under Sections 111 and 112 of the Clean Air Act, <u>42 U.S.C. §§ 7411</u> and <u>7412</u>;[8] <u>(2)</u> unlike in other industry sectors, state agencies rely on AP-42 methodologies in permitting actions because fugitive emissions of landfill gas cannot be easily quantified via typical testing or quantification methodologies; and (3) the Table HH-3 values may be revised as a result of reconsideration, and therefore should not be used on a piecemeal or temporary basis pending completion of reconsideration.

In light of EPA's agreement to reconsider the Table HH-3 collection efficiencies in the Final GHGRP Rule and its subsequent incorporation of those same collection efficiencies into the Final AP-42 Revision, NWRA requests that EPA reconsider the Final AP-42 Revision. Interested parties could not and did not anticipate that EPA would wholly incorporate Table HH-3 into the final version of AP-42 Section 2.4, and did not have an opportunity to comment on that change. Accordingly, the Final AP-42 Revision was not the "logical outgrowth" of the 2024 Draft AP-42 Revisions. Moreover, Petitioner believes that the Table HH-3 collection efficiency values are legally and technically deficient and that their incorporation into the Final AP-42 Revision will have effects that extend well beyond the scope of the GHGRP and AP-42, as contemplated by Congress.

For the reasons set forth herein, Petitioner also asks for EPA to administratively stay the Final AP-42 Revision pending reconsideration with respect to the Final GHGRP Rule Table HH-

---

[8] 40 C.F.R. Part 60, Subparts XXX (Standards of Performance for Municipal Solid Waste Landfills That Commenced Construction, Reconstruction, or Modification After July 17, 2014 ), and Cf (Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills ) (collectively, "NSPS"); 40 C.F.R. Part 62, Subpart OOO (Federal Plan Requirements for Municipal Solid Waste Landfills That Commenced Construction On or Before July 17, 2014 and Have Not Been Modified or Reconstructed Since July 17, 2014); and 40 C.F.R. Part 63, Subpart AAAA National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills ("NESHAP").

2915468_6

3 collection efficiencies set forth therein, under Section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7407(d)(7)(B). In the alternative, and to the extent the Final AP-42 Revision raises novel questions of law, Petitioner asks EPA to immediately revise Section 2.4 of AP-42 to remove the incorporation by reference of the Table HH-3 collection efficiencies set forth in the Final GHGRP Rule, at least until EPA completes its approved reconsideration of those values.

## II.    BACKGROUND

### A.    History of AP-42

EPA began publishing AP-42 emission factors in 1972. In 1990, Congress amended the Clean Air Act to include Section 130, 42 U.S.C. § 7430, which mandates a periodic review and revision of AP-42 emission factors:

> Within 6 months after November 15, 1990, and at least every 3 years thereafter, the Administrator shall review and, if necessary, revise, the methods ("emission factors") used for purposes of this chapter to estimate the quantity of emissions of carbon monoxide, volatile organic compounds, and oxides of nitrogen from sources of such air pollutants (including area sources and mobile sources).

42 U.S.C.A. § 7430; *Clean Air Act, Amendments*, Pub. L. 101–549, 104 Stat 2399, 804 (Nov. 15, 1990).

EPA first issued emission factors applicable to MSW landfills in 1998. EPA published updates to Chapter 2, Section 4 in 2008, but that draft was never finalized. The 2008 draft specifically provided:

> Emissions from landfills are typically controlled by installing a gas collection system, and either combusting the collected gas through the use of internal combustion engines, flares, or turbines, or by purifying the gas for direct use in place of a fuel such as natural gas. Gas collection systems are not 100% efficient in collecting landfill gas so emissions of $CH_4$ and NMOC at a landfill with a gas recovery system still occur. To estimate controlled emissions of $CH_4$, NMOC, and other constituents in landfill gas, the collection efficiency of the system must first be estimated. Reported collection efficiencies typically range from 50 to 95% with a default efficiency of 75% recommended by EPA for inventory purposes. . . . If documented site-specific collection efficiencies are available (i.e., through a

comprehensive surface sampling program), then they may be used instead of the 75% average."

*See* 2008 Draft, § 2.4.4.2, at 2.4-8.[9]

On July 29, 2022, several organizations initiated litigation against EPA, seeking to compel the Agency to act pursuant to its nondiscretionary duty under Section 130 of the Clean Air Act to review, and revise as necessary, the emission factors used to estimate the quantity of emissions of carbon monoxide, volatile organic compounds, and oxides of nitrogen with respect to MSW landfills under AP-42, Chapter 2, Section 4.[10] The Complaint alleges that EPA, in publishing the 2008 Draft, "expressly acknowledge[d] that [the emission factors applicable to MSW landfills] [were] inaccurate in ways that tend to underestimate emissions."[11] The Complaint went on to allege that AP-42 estimates "are used in state and regional emission inventories," which, according to EPA's own statements are "typically the first part of the development of a regional or national control strategy to reduce area-wide emissions."[12] Accordingly, the plaintiffs specifically asserted that EPA's failure to update the 24-year-old emission factors under AP-42, Section 2.4 was in contravention of EPA's duties under Section 130 of the Clean Air Act, and as a result, made plaintiffs less able to "analyze whether landfills are meeting legal requirements under the Clean Air Act, including permit and regulatory requirements."[13]

---

[9] As stated *supra* n. 3, the 2008 draft was informative, and differed only slightly from the then-effective 1998 version, which articulated a collection efficiency range of 60 to 85%, with 75% most commonly assumed. AP-42 (Nov. 1998), § 2.4.4.2, at 2.4–6.

[10] *See* Complaint for Petitioner, *Env't Integrity Proj. v. Michael Regan*, 1:22-cv-02243 (D.D.C. July 29, 2022) ("EIP Case").

[11] Complaint ¶ 2.

[12] *Id.* ¶ 3 (citing U.S. Env't Prot. Agency, EPA-453/B-21-001, Recommended Procedures for Development of Emission Factors and Use of the WebFIRE Database, 4-1 (2021)).

[13] *Id.* ¶ 19.

2915468_6

The parties in the *EIP* Case eventually reached a settlement, evidenced by a proposed consent decree, which stipulated that EPA would review, and if necessary, revise "the methods ("emission factors") used to estimate the quantity of emissions of carbon monoxide, volatile organic compounds, and oxides of nitrogen under CAA section 130, 42 U.S.C. § 7430," applicable to the MSW landfills by January 15, 2024, and final revisions by August 15, 2024.[14] The consent decree set forth a period for public comment, in which NWRA and the Solid Waste Association of North America ("SWANA") submitted a joint comment in support of EPA's plan to review Section 2.4 emission factors, stating that "[i]f EPA determines that updates are necessary, NWRA and SWANA look forward to reviewing the draft revisions and providing supporting information."[15]

      **B.**       **2024 Draft Revisions to AP-42 Section 2.4.**

In accordance with the proposed consent decree, EPA published draft revisions to Section 2.4 on its webpage on January 12, 2024. With respect to collection efficiency values, the 2024 Draft AP-42 Revisions did not propose any substantive change to the discussion of collection efficiency values. Instead, consistent with the 1998 version of AP-42, the 2024 Draft AP-42 Revisions stated:

> Emissions from landfills are typically controlled by installing a gas collection system and combusting the collected gas through the use of internal combustion engines, flares, or turbines. Gas collection systems are not 100% efficient in collecting landfill gas, so emissions of $CH_4$ and NMOC at a landfill with a gas recovery system still occur. To estimate controlled emissions of $CH_4$, NMOC, and other constituents of landfill gas, the collection efficiency of the system must first be estimated. Reported collection efficiencies typically range from 60 to 85%, with an average of 75% most commonly assumed. Higher collection efficiencies may be achieved at some sites (i.e., those engineered to control gas emissions). If site-specific collection efficiencies are available (i.e., through a comprehensive surface sampling program), then they should be used instead of the 75% average.

---

[14] *See Proposed Consent Decree, Clean Air Act Citizen Suit*, 88 Fed. Reg. 8425, 8426 (Feb. 9, 2023).
[15] EPA-HQ-OGC-2023-0046-0001, NWRA/SWANA Comment, at 1.

2915468_6

§ 2.4.4.2, at 2.4-5.

EPA offered a 60-day period for public comment, ending on March 12, 2024. Several interested parties submitted comment, including NWRA and SWANA, the Environmental Integrity Project ("EIP"), John Zink Company, LLC, and APTIM/LFG Specialties, LLC.

NWRA and SWANA did not offer any comment on collection efficiency because EPA did not indicate that it was contemplating any substantive change to the collection efficiency discussion in Section 2.4. EIP submitted a comment on March 12, 2024, requesting that EPA "require lower default collection efficiency values for landfills with unregulated [gas collection and control systems] as it has proposed to do in the GHGRP."[16] Namely, EIP stated that EPA should incorporate a 10% reduction in default collection efficiencies as proposed by EPA in its 2023 Supplemental GHGRP Proposal for unregulated landfills that do not conduct regular surface methane concentration monitoring. EIP cited the same rationale as EPA used in its 2023 Supplemental GHGRP Proposal to request this change, asserting that MSW landfills with regulated GCCS (i.e., MSW landfills subject to NSPS, EG, or Federal Plan) report higher collection efficiency as a result of being subject to SEM requirements.

### C. The Finalized Version of AP-42.

On August 15, 2024, EPA revised the collection efficiency provisions in the Final AP-42 Revision, citing EIP's comment to incorporate the collection efficiency values as finalized in the Final GHGRP Rule. *See Summary of AP-42 Chapter 2, Section 4 Changes since Draft*. However, EIP's suggestion was by then outdated, because EPA had decided in the Final GHGRP Rule to

---

[16] EIP Comment, at 12 (March 12, 2024), https://www.epa.gov/system/files/documents/2024-07/2024.03.12-final-comments-on-landfills-ap42.pdf.

2915468_6

impose an across-the-board reduction of those finalized collection efficiency values, but this time for all landfills, without regard to whether a landfill has undertaken SEM practices. Specially, the text of Section 2.4.4.2 was revised to state the following:

> Emissions from landfills are typically controlled by installing a gas collection system and combusting the collected gas through the use of internal combustion engines, flares, or turbines. Gas collection systems are not 100% efficient in collecting landfill gas, so emissions of CH 4 and NMOC at a landfill with a gas recovery system still occur. To estimate controlled emissions of CH4, NMOC, and other constituents of landfill gas, the collection efficiency of the system must first be estimated. ***Different models exist to provide a better estimate for uncontrolled emissions that are more appropriate for emission inventory development (e.g. LandGEM) that incorporates waste degradation parameters which include potential to generate methane and the waste degradation decay rate. The potential to generate methane is a function of waste type, and age of waste. The waste degradation decay rate is a function of waste type, age of waste, and waste moisture. Waste moisture might be changed by leachate recirculation and rainfall rates.*** Higher collection efficiencies may be achieved at some sites (i.e., those engineered to control gas emissions). If site-specific collection efficiencies are available (i.e., through a comprehensive surface sampling program), then they should be used instead. ***If a user lacks site-specific collection efficiencies, use the appropriate values in Table HH-3 to subpart HH of Part 98 – Landfill Gas Collection Efficiencies for calculations. See section III.T.2 of the preamble of the GHGRP final rule (89 FR 31853 April 25, 2024) for more information on the finalized collection efficiencies in Table HH-3 and default collection efficiency.***

(emphasis added to show changes). EPA acknowledges, in its Response to Comment document, that "[s]ince [EIP's] comment was received, final revisions to the GHGRP were published on April 25, 2024[.]"[17] In this respect, EPA expressly acknowledges that it implemented provisions of subpart HH that were not subject to public comment during consideration of the 2024 Draft AP-42 Revisions through March 12, 2024, because Subpart HH was not finalized until April 25, 2024.

---

[17] *See Response to Comments on Draft Revisions to AP-42 Chapter 2, Section 4 – Municipal Solid Waste Landfills August 2024*, at 11.

2915468_6

## III. EPA's updates to Chapter 2, Section 4 of AP-42 constitute a "final action" subject to review and reconsideration under Section 307 of the Clean Air Act.

Section 307(b)(1) of the Clean Air Act provides that a petition for review of any "final action taken" by the Administrator may be filed in the United States Court of Appeals for the District of Columbia. The Clean Air Act's requirement of "final action" "tracks the Administrative Procedure Act's finality requirement" under 5 U.S.C. § 704. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020). Accordingly, an EPA action will be considered "final" if "two independent conditions are met":

(1) The action marks the consummation of the agency's decision-making process, and

(2) Rights or obligations are determined by the action, and legal consequences flow therefrom.

*Id.* (citing *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).

With respect to the first condition, courts will determine "whether an action is properly attributable to the agency action itself and represents the culmination of that agency's consideration of an issue." *Id.* (citing *NRDC v. Wheeler*, 935 F.3d 68, 78 (D.C. Cir. 2020) (finding that an EPA guidance document which "speaks in EPA's voice," sets forth the interpretation of EPA, and was approved by the Administrator's principal advisor, is consummated)). Agency decisions "premised on the [] current understanding of [] science" therefore establishing possibility of future revision, "does not make an otherwise definitive decision nonfinal." *Id.*

"Final" agency actions under the Clean Air Act, as they are traditionally understood, are governed by Section307(d). 42 U.S.C. § 7607(d). Section 307(d) requires (1) "notice of proposed rule making shall be published in the Federal Register"; (2) a period for "any person to submit written comments, data, or documentary information"; and (3) publication of the "promulgated

16

rule" "accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." § 307(d)(3)–(6); 42 U.S.C. § 7607(d)(3)–(6).

Here, the Final AP-42 Revision, and the process leading up to it, have some of the key trappings of a rulemaking because EPA instituted notice and solicited comment, albeit in an untraditional manner.[18] Specifically, EPA updated the AP-42 webpage and published the 2024 Draft Revisions on January 12, 2024. EPA accepted comments through March 12, 2024, in recognition that AP-42 may directly affect regulated entities. *See also* AP-42 Introduction, at 10 ("Since AP-42 emission factors may have effects on most aspects of air pollution control and air quality management (e.g., operating permit fees, and SIP attainment emission inventories), these factors are always made available for public review and comment before publication.") On August 15, 2024, EPA published the Final AP-42 Revisions, along with the comments received and a response to comment document. While the 2024 Draft Revisions and accompanying notice were published on EPA's website rather than in the Federal Register, and the Final AP-42 Revisions appear to have been made effective upon publication, EPA nonetheless mimicked the rulemaking process mandated by Section 307 of the Clean Air Act and Section 553 of the Administrative Procedure Act, resulting in the culmination of the Agency's consideration of the issue. There is no question that AP-42 is published with EPA's "voice," as it is the consummation of EPA's decision-making. Notably, and as set forth at length above, EPA was forced to consummate its decision-making with respect to the Final AP-42 Revision by a Clean Air Act citizen suit and related consent decree.[19]

---

[18] Because NWRA believes that the Final AP-42 Revision equates to a final agency action, NWRA also believes that EPA failed to abide in full by the requirements set forth in Section 307(d). *See infra*, Section IV.D.

[19] *Envt'l Integrity Proj. v. Michael Regan*, 1:22-cv-02243 (D.D.C. July 29, 2022); *Proposed Consent Decree, Clean Air Act Citizen Suit*, 88 Fed. Reg. 8425 (Feb. 9, 2023).

2915468_6

With respect to the second requirement, regarding whether rights or obligations are determined by the action, reviewing courts will "pragmatically focus on the concrete consequences the action has or does not have as a result of the specific statues and regulations that govern it." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 405 (D.C. Cir. 2020). In *POET*, the Court held that EPA guidance clarifying the method for determining the cellulosic fraction of corn kernels under the renewable fuel standards program did constitute an action with appreciable consequences flowing from it. *Id.*

So too here. The Final AP-42 Revision constitutes a "final action" because legal consequences flow from AP-42 as applicable to MSW landfills, so much so that EIP sued EPA for failing to update the Section 2.4 emission factors since 1998, which they allege was in contravention of EPA's duties under Section 130 of the Clean Air Act, 42 U.S.C. § 7430.[20] As a result of the litigation, EPA agreed to, and did, update Section 2.4.[21] EPA was certainly subject to legal consequences for shirking its statutory responsibility relating to the establishment of these emission factors; it would be naïve or disingenuous to assert that such a citizen suit was instituted and settled for purposes of prompting an action which would have no effect whatsoever on the regulated entities that are the subject of the action.

Unlike other industrial sectors, the specific statutes and regulations that govern MSW landfills presume or require use of AP-42 for the estimation of emissions. Specifically, as set forth at length below in Section IV.B, both the NSPS and the NESHAP refer directly to AP-42 emission factors. By virtue of the Final AP-42 Revision, and because of the cross-references to AP-42 from the NSPS and NESHAP, EPA has altered the legal landscape for MSW landfills subject to the NSPS and NESHAP, who are directed to use AP-42 emission factors and

---

[20] *See* Complaint for Petitioner, *Envt'l Integrity Proj. v. Michael Regan*, 1:22-cv-02243 (D.D.C. July 29, 2022).
[21] 88 Fed. Reg. at 8426.

2915468_6

methodologies. Further, because MSW landfill emissions cannot be tested or quantified in the same way as most other emission sources, state permitting agencies rely heavily on Section 2.4 of AP-42 in permitting matters. *See infra* Section IV.B.

The inability to directly measure fugitive landfill gas emissions makes the AP-42 emission factors for this sector extremely important. EPA is acutely aware of these limitations, as evidenced in part by the fact that GHGRP subpart HH is inherently a modeling scheme. Further, the very basis of EPA's revisions to Table HH-3 in the Final GHGRP Rule acknowledge the uncertainty associated with landfill emission estimation methodologies. By its very nature and purpose, the GHGRP is a *reporting* rule; but, by incorporating the Final GHGRP Rule collection efficiencies into the Final AP-42 Revision, EPA has directly and immediately affected landfill emission quantification for purposes of determining compliance with NSPS, NESHAP, and permitting matters.

## IV.    Requested Grounds for Reconsideration

Pursuant to Section 307(d)(7)(B) of the Clean Air Act, EPA "shall convene a proceeding for reconsideration of [a] rule and provide the same procedural rights as would have been afforded had this information been available at the time the rule was proposed" so long as the party seeking reconsideration can demonstrate: (1) "that it was impracticable to raise such objection" during the public comment period or that "the grounds for such objection arose after the period for public comment (but within the time specified for judicial review)"; and (2) "such objection is of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B).

2915468_6

A. **EPA did not afford interested parties with adequate notice of the incorporation of Subpart HH collection efficiency values into AP-42; therefore the Final AP-42 Revision is not the "logical outgrowth" of the 2024 Draft AP-42 Revisions.**

NWRA could not practicably raise its objection to the incorporation of the Final GHGRP Rule collection efficiency values during the period for public comment on the Final AP-42 Revision because the grounds for the objection "arose after the period for public comment." CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B).

The practicability of raising an objection during the public comment period is dependent on EPA providing adequate notice of the changes it purports to finalize. The Clean Air Act generally incorporates the notice requirements set forth in the Administrative Procedure Act,[22] which are designed to (1) ensure exposure to diverse public comment, (2) ensure fairness to affected parties, and (3) give affected parties an opportunity to develop evidence in the record to support their objections and enhance the quality of judicial review. *Int'l Union, United Mine Workers of America v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C.Cir.2005). In the traditional sense, notice, including the facts and data on which the agency intends to rely, is required to come from Notices of Proposed Rulemaking, which are traditionally published in the Federal Register.[23] Notice, therefore, cannot be "bootstrap[ped]" from a comment received during the comment period after a Notice of Proposed Rulemaking has been published. *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C.Cir.1991).

If agencies "fail[] to disclose to interested persons the factual material upon which the agency was relying," the elements of fairness which are "essential to any kind of administrative

---

[22] "Notice" requirements under CAA Section 307(d) and APA Section 553 are typically applicable to rulemakings promulgated in the traditional manner—*i.e.*, publication of a Notice of Proposed Rulemaking in the Federal Register and a period for public comment.

[23] The principle remains applicable to this situation, where instead of publishing a Notice of Proposes Rulemaking, EPA published draft updates to AP-42 on the AP-42 homepage, and stated where interested parties could submit comment during a 60-day comment period.

20

action" are vitiated by preventing interested persons from submitting comments of "cogent materiality." *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977).

Moreover, without adequate notice, it is widely recognized that a final rule does not equate to the "logical outgrowth" of the proposal. *See, e.g.*, *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004); *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 648 (D.C. Cir. 2019) (stating that the "impracticability prong" of Section 307(d)(7)(B) covers "instances when the final rule was not a logical outgrowth of the proposed rule"). A final rule is the "logical outgrowth" of a proposed rule only if interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

In contrast, agencies cannot justify changes implemented in a final rule by placing an "unreasonable burden on commentors not only to identify errors in a proposed rule but also to contemplate why every theoretical course of correction the agency might pursue would be inappropriate or incorrect." *Chesapeake Climate Action Network*, 952 F.3d at 320 (holding that a party's ability to comment on an *issue* generally does not in and of itself demonstrate sufficient notice from EPA). While an agency "need not subject every incremental change in its conclusions after each round of notice and comment to further public scrutiny before final action," *Sierra Club v. Costle*, 657 F.2d 298, 352 (D.C. Cir. 2981), interested parties must be able to anticipate that the change was possible, and could have submitted comments relating to the change. *Northeast Md. Waste Disposal Auth.*, 358 F.3d at 952 (finding that a final rule which collapses the proposed rule's three categories into two is the logical outgrowth of the proposed

21

rule); *Envt'l Integrity Project*, <u>425 F.3d at 996</u> ("The Court will refuse to all agencies to use the rulemaking process to pull a surprise switcheroo on the regulated entities.").

Here, the 2024 Draft Revisions did not provide Petitioner with adequate notice that EPA would incorporate by reference the new collection efficiency values from Table HH-3 of the Final GHGRP Rule; or even that EPA would consider changing the collection efficiency value at all. Instead, EPA proposed no substantive change to the existing language of AP-42, setting forth a typical range of collection efficiencies and default average of 75%. *See* 2024 Draft Revisions, § 2.4.4.2. EPA did not propose any change to collection efficiency, nor has EPA ever directly referenced Table HH-3 collection efficiencies in any prior versions of Section 2.4. Further, neither the Federal Register notice nor the proposed consent decree describing EPA's obligation to finalize its review and revision of Section 2.4 of AP-42 indicated that collection efficiency values would be reviewed.[24] As proposed, Petitioner could not have reasonably anticipated that EPA would finalize the collection efficiency values as it did.

In addition, Petitioner and other interested parties could not have possibly raised comments relating to the new collection efficiency values established in the Final GHGRP Rule, because the new collection efficiencies literally did not exist during the period for public comment on AP-42, which began January 12, 2024 and ended on March 12, 2024. The Final GHGRP Rule was not published until April 25, 2024, over one month after the close of the period for public comment.[25] Nor could Petitioner advance a comment in anticipation of the new collection efficiency values—as outlined extensively in Attachment B hereto, the new collection efficiency values equated to a surprise and impermissible "switcheroo," which interested parties

---

[24] *Proposed Consent Decree, Clean Air Act Citizen Suit*, <u>88 Fed. Reg. 8425</u> (Feb. 9, 2023).
[25] *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, <u>89 Fed. Reg. 31802</u> (April 25, 2024).

2915468_6

similarly could not practicably comment during the period for public comment for the Final GHGRP Rule. *Env'l Integrity Project*, 425 F.3d *v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). As noted above, EPA has granted reconsideration of Subpart HH of the GHGRP on this basis.

EPA's indication that its incorporation of the Table HH-3 collection efficiency values was prompted by a comment from EIP (suggesting that EPA utilize proposed collection efficiency values from the now-discarded 2023 Supplemental GHGRP Proposal) does not provide adequate notice and opportunity to comment. Citing EIP's comment as a means to finalize a change that otherwise could not have been reasonably anticipated by interested parties equates to an impermissible "bootstrap" of notice from EIP's comment, which cannot satisfy the elements of procedural fairness required under Section 307(d)(7)(B) of the Clean Air Act. *Fertilizer Inst.*, 935 F.2d at 1312.

> **B.** **The incorporation of Subpart HH collection efficiency values should be reconsidered because NWRA's objections are of "central relevance to the outcome of" AP-42, Chapter 2, Section 4.**

An objection is of central relevance if it "provides substantial support for the argument that the regulation should be revised." *Coal. For Responsible Regulation v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012); *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982).

NWRA objects to the incorporation of the new Subpart HH collection efficiency values because collection efficiency is a central component of Section 2.4. EPA has acknowledged, across each version of Section 2.4, that estimating controlled emissions of $CH_4$, methane, and other constituents in landfill gas begins with estimating collection efficiency.[26] Thus, if estimation of collection efficiency is inaccurate, unreliable, or technically unsound, the resulting emissions estimation will be hindered as a result.

---

[26] *See* AP-42 (Nov. 1998), § 2.4.4.2, at 2.4-6; 2008 Draft, § 2.4.4.2, at 2.4-8; Final AP-42 Revision, § 2.4.4.2, at 2.4-6.

2915468_6

As explained in NWRA's Petition for Reconsideration of the GHGRP, the finalized collection efficiency values in Table HH-3 are fundamentally flawed and based on faulty scientific reasoning. In fact, the arbitrarily reduced values undermine the very purpose and objective of the GHGRP—to promote the accurate and comprehensive collection and reporting of greenhouse gas emission data.[27] The same flaws are true for AP-42 Section 2.4; by directly implementing the flawed collection efficiency values, EPA is further enabling inaccurate emissions calculations, with far-reaching effects beyond those resulting from the GHGRP. Unlike the GHGRP, AP-42 is used in permitting and compliance matters for MSW landfills. For example, AP-42 is directly referenced in the following federal regulatory provisions:

- **Standards of Performance for Municipal Solid Waste Landfills That Commenced Construction, Reconstruction, or Modification After July 17, 2014 ("subpart XXX")** –

  - 40 C.F.R. § 60.764(c):

    When calculating emissions for Prevention of Significant Deterioration purposes, the owner or operator of each MSW landfill subject to the provisions of this subpart must estimate the NMOC emission rate for comparison to the Prevention of Significant Deterioration major source and significance levels in §§ 51.166 or 52.21 of this chapter using Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources (AP-42) or other approved measurement procedures.

  - 40 C.F.R. § 60.765(a)(1):

    For the purposes of calculating the maximum expected gas generation flow rate from the landfill to determine compliance with § 60.762(b)(2)(ii)(C)(1), either Equation 5 or Equation 6 must be used. The methane generation rate constant (k) and methane generation potential ($L_0$) kinetic factors should be those published in the most recent Compilation of Air Pollutant Emission Factors (AP-42) or other site-specific values demonstrated to be appropriate and approved by the Administrator.[28]

---

[27] Rather than restating the legal and technical arguments relating to the Table HH-3 collection efficiency values herein at length, NWRA has attached and incorporated by reference its Petition for Reconsideration as Attachment B.

[28] In prior versions of Section 2.4, EPA discussed k and $L_0$ in the context of calculating uncontrolled emissions using AP-42 Equation 1, known as the Landfill Air Emissions Estimation Model. In the Final AP-42 Revision, EPA removed all discussion of k and $L_0$ and instead incorporated by reference the estimated generation rate from Equation HH-1 of the GHGRP. In doing so, EPA replaced $L_0$ with DOC, and stipulated that "DOC can be

24

2915468_6

- **Subpart Cf—Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills**

  - 40 C.F.R. § 60.35f(c):

    When calculating emissions for Prevention of Significant Deterioration purposes, the owner or operator of each MSW landfill subject to the provisions of this subpart must estimate the NMOC emission rate for comparison to the Prevention of Significant Deterioration major source and significance levels in § 51.166 or § 52.21 of this chapter using Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources (AP-42) or other approved measurement procedures.

  - 40 C.F.R. § 60.36f(a)(1):

    For the purposes of calculating the maximum expected gas generation flow rate from the landfill to determine compliance with § 60.33f(b)(2)(i), either Equation 5 or Equation 6 in paragraph (a)(1)(i) or (ii) of this section must be used. The methane generation rate constant (k) and methane generation potential (Lo) kinetic factors should be those published in the most recent AP-42 or other site-specific values demonstrated to be appropriate and approved by the Administrator.

- **Subpart OOO—Federal Plan Requirements for Municipal Solid Waste Landfills That Commenced Construction On or Before July 17, 2014 and Have Not Been Modified or Reconstructed Since July 17, 2014**

  - 40 C.F.R. § 62.16718(c):

    When calculating emissions for Prevention of Significant Deterioration purposes, the owner or operator of each MSW landfill subject to the provisions of this subpart must estimate the NMOC emission rate for comparison to the Prevention of Significant Deterioration major source and significance levels in §§ 51.166 or 52.21 of this chapter using Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources (AP-42) or other approved measurement procedures.

  - 40 C.F.R. § 62.16720(a)(1):

---

considered a direct measurement of biodegradable carbon in a waste sample," which is "proportional" to the "amount of methane produced." *See Response to Comments on Draft Revisions to AP-42 Chapter 2, Section 4 – Municipal Solid Waste Landfills August 2024,* at Comment 8.2 By making this change, EPA has effectively attempted to revise the NSPS and NESHAP, without abiding by Section 307(d)'s rulemaking requirements, both of which incorporate the "methane generation rate constant (k) and methane generation potential ($L_0$) . . . published in the most recent Compilation of Air Pollutant Emission Factors (AP-42)." 40 C.F.R. §§ 60.756(a)(1); 60.36f(a)(1); 62.16720(a)(1); and 63.1960(a)(1). NWRA/SWANA raised this concern in its comment letter to the 2024 Draft Revisions, but EPA did not revise the proposal to address it. *See* NWRA/SWANA Comment, at 4.

2915468_6

For the purposes of calculating the maximum expected gas generation flow rate from the landfill to determine compliance with § 62.16714(b)(2)(i), either Equation 5 or Equation 6 must be used. The methane generation rate constant (k) and methane generation potential (Lo) kinetic factors should be those published in the most recent AP-42 or other site-specific values demonstrated to be appropriate and approved by the Administrator.

- **Subpart AAAA—National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills**

  o <u>40 C.F.R. § 63.1960(a)(1):</u>

    <u>For</u> the purposes of calculating the maximum expected gas generation flow rate from the landfill to determine compliance with § 63.1959(b)(2)(ii)(C)(1), either Equation 5 or Equation 6 must be used. The owner or operator may use another method to determine the maximum gas generation flow rate, if the method has been approved by the Administrator. The methane generation rate constant (k) and methane generation potential (Lo) kinetic factors should be those published in the most recent Compilation of Air Pollutant Emission Factors (AP-42) or other site-specific values demonstrated to be appropriate and approved by the Administrator.

While Petitioner acknowledges that each of the above-referenced provisions stipulate that "other site-specific values demonstrated to be appropriate and approved by the Administrator" are acceptable alternatives to the use of AP-42, EPA is aware that at this moment in time, there is no generally accepted industry standard for the establishment of a "site-specific" collection efficiency value based on a comprehensive methane surface sampling program. Indeed, as discussed *supra* in Section I, EPA expressly decided against tying collection efficiency to SEM in the Final GHGRP Rule.[29] Thus, the notion that alternatives may be approved, if appropriate, is a hollow option that ignores the practical reality faced by landfills, and instead tends to prompt states to rely on AP-42 for compliance purposes. Unlike other sources addressed within AP-42, landfill emissions are not conducive to the types of preferred emission factors that may be

---

[29] *See supra*, n. 5.

2915468_6

utilized in permitting actions.[30] As noted by EPA in its 2020 Enforcement Alert entitled "*EPA Reminder About Inappropriate Use of AP-42 Emission Factors*," inappropriate use of AP-42 emission factors can be costly, inefficient, and in some circumstances can subject regulated entities to enforcement and penalties. EPA very clearly states that AP-42 factors should not be used in permitting actions, and instead recommends emission factors as a last resort to other methodologies such as Continuous Emission Monitoring Systems ("CEMS"), stack testing, vendor guarantees and stack test data from similar facilities, material balance calculations, and optical remote sensing. EPA is aware that none of these methodologies exist for the quantification of fugitive landfill gas emissions, which means that AP-42 factors are indeed the last resort option, one that is relied upon heavily by states in evaluating landfill applications. As a result, EPA should feel a weight of obligation to ensure that such factors are as accurate as possible. As discussed below, the use of optical remote sensing and associated analyses somewhat informed EPA's thinking in the Final GHGRP Rule, but those methods are premature because they are under investigation and review right now by EPA, industry, academics, and others.

NWRA members have been subjected to states' required use of AP-42, both in initial permitting actions for purposes of estimating VOC and/or methane emissions, and in ongoing demonstrations of compliance. At one Pennsylvania landfill, a recently issued MSW landfill expansion permit directs that the permittee "shall calculate and record the monthly and 12-month rolling average VOC emissions from the… Landfill, using Department approved methods and the latest edition of AP-42 Chapter 2.4."[31] In Colorado, the CDPHE has issued guidance relating to the disposal of petroleum contaminated soils that relies on AP-42 co-disposal factors for

---

[30] *See* AP-42 Disclaimer, at 2.4-1 ("We recommend source testing be done for the best possible emission values.").
[31] *See* Relevant Excerpt from Pennsylvania MSW Landfill Operating Permit, attached hereto as "Attachment D."

2915468_6

emission estimation. Moreover, the CDPHE routinely implements the AP-42 Section 2.4 emission factor into compliance provisions of MSW landfill operating permits. Specifically, CDPHE lists AP-42 Section 2.4 as the "Compliance Emission Factor" applicable to fugitive (or "uncollected") emission limits of, for example, VOC, CO, and HAPs.[32] In South Carolina, limitation, monitoring, and reporting permit conditions directly reference the collection efficiency values contained within AP-42.[33] Similarly, in Arizona, ADEQ incorporates the "site specific values demonstrated to be appropriate" from AP-42 for the purposes of calculating the maximum expected gas generation flow rate.[34] Consistent with the prior version of AP-42, most states and permittees have utilized the default collection efficiency value of 75% in permitting matters, and higher collection efficiency values have been used where appropriate. However, unlike the range of likely values provided in the prior version of AP-42, the revised version of Table HH-3 in the Final GHGRP Rule precisely defines collection efficiency values for various operating conditions, and effectively caps collection efficiency at 85% for even the most well-performing landfill area equipped with a GCCS and three feet of soil or clay for final cover. For active areas with a GCCS and daily cover, the revised Table HH-3 would allow for only 50% collection efficiency, despite the fact that many operating landfills would achieve much higher collection efficiencies. As a simple illustration of the effects of using the changed collection efficiency values in Table HH-3 in conjunction with the GHGRP HH-8 equation, as compared to the prior version of Table HH-3, consider the following example. If 100 tons of methane are collected, using the collection efficiency of 60% from the prior version of Table HH-3 yields 67 tons of fugitive methane emissions. At the new 50% collection efficiency value with the same

---

[32] *See* Relevant Excerpts from Colorado MSW Landfill Operating Permits, attached hereto as "Attachment E."
[33] *See* Relevant Excerpt from South Carolina MSW Landfill Operating Permit, attached hereto as "Attachment F."
[34] *See* Relevant Excerpt from Arizona MSW Landfill Operating Permit, attached hereto as "Attachment G."

2915468_6

100 tons of collected methane, the resulting fugitive methane emissions are 100 tons. Thus, a 10% drop in collection efficiency results in a 33% increase in emissions.

In essence, AP-42 is not optional for MSW landfills, and the importation of new Table HH-3 collection efficiency values into AP-42 from the Final GHGRP will have a significant effect on the calculation of landfill gas emissions.[35] By incorporating flawed collection efficiencies from the Final GHGRP Rule into AP-42, EPA is directly affecting the quantification of emissions from MSW landfills in a manner that will affect both compliance and permitting matters. As such, NWRA's objections pertain to critical portions of AP-42 satisfying the "central relevance" requirement set forth under Section 307(d)(7)(B) of the Clean Air Act. *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982). Accordingly, Section 2.4 should be revised.

**C.      The collection efficiency values from Table HH-3 of the GHGRP are technically deficient and their incorporation into AP-42 is therefore arbitrary and capricious.**

An agency action is arbitrary and capricious if there does not exist a "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rational connection between the facts found and the choices made does not exist if, among other reasons, the agency failed to consider an important aspect of the problem or the agency offers an explanation for its decision that runs counter to the evidence. *Id.* While reviewing courts are generally deferential with respect to

---

[35] Importantly, as discussed in greater detail below, prior to the Final AP-42 Revision, permittees and state agencies have never before been required to utilize factors or assumptions from the GHGRP in permitting matters, and GHGRP emission estimates have not been relevant to permitting programs. See, for example, EPA's preamble discussion of the GHGRP in its recent rule proposal entitled *Clarifying the Scope of "Applicable Requirements" Under State Operating Programs and the Federal Operating Permit Programs*, 89 Fed. Reg. 1150-1188 (January 9, 2024): "Other substantive CAA programs relevant to stationary sources are similarly not identified in the EPA's regulatory definition of 'applicable requirement' for title V purposes because Congress did not intend for them to be implemented through the title V program. … Another example is the Greenhouse Gas Reporting Program in 40 CFR part 98. That program applies to stationary sources and uses the authorities provided in CAA sections 114 and 208 to collect greenhouse gas emissions information, but it is not an applicable requirement for title V purposes."

decisions involving agency expertise, *Huntsman Petrochemical LLC v. EPA*, No. 23-1045, 2024 WL 3763355, at *3 (D.C. Cir. Aug. 13, 2024*)*, agencies are forbidden from reaching "whatever conclusions [they] like" and defending such positions "with vague allusions to [their] own expertise." *Sierra Club v. EPA*, 972 F.3d 290 (3d Cir. 2020) ("Although EPA has offered vague allusions to the inability of unspecified plants to meet a lower standard, the agency has deprived us of the ability to review its decision by showing its work."). Put simply, an agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).

As set forth at length in NWRA's Petition for Reconsideration of the GHGRP, EPA failed to establish a rational connection between the facts found and the choices made with respect to the new collection efficiencies encompassed within Table HH-3 of the GHGRP Rule, which is now repeated in the Final AP-42 Revision. Petitioner reiterates here that the data and studies upon which EPA relied[36] are fundamentally flawed, incomplete, and do not provide an adequate basis of support for the across-the-board reduction to collection efficiency values.[37] EPA has agreed via its grant of reconsideration to further consider this determination and should do so here as well.

In support of EPA's reconsideration proceedings relating to the GHGRP, EPA, Petitioner, and other interested parties are closely examining data and measurement methodologies affecting collection efficiency with the goal of advancing a methodology that can be used accurately and reliably to quantify greenhouse gas emissions from MSW landfills. These efforts are being

---

[36] Duan, Z., et al., *Efficiency of gas collection systems at Danish landfills and implications for regulations*, 139 Waste Management 269–78 (2022), https://doi.org/10.1016/j.wasman.2021.12.023; Nesser, H., et al., *High-resolution U.S. methane emissions inferred from an inversion of 2019 TROPOMI satellite data: contributions from individual states, urban areas, and landfills*, EGUSPHERE [preprint] (2023), https://doi.org/10.5194/egusphere-2023-946; and supplement https://egusphere.copernicus.org/preprints/2023/egusphere-2023-946/egusphere-2023-946-supplement.pdf.
[37] *See* Attachment B, Section II.C.

2915468_6

undertaken in conjunction with a broad-based interest in advancing alternative methodologies and new technologies for methane sensing and quantification.

In particular, the Environmental Research and Education Foundation ("EREF") is working closely with industry and academic partners to advance overall understanding and learnings with respect to emission estimation and quantification. EREF hosted a Landfill Emissions Workshop at its headquarters in Raleigh, North Carolina in September 2024, wherein experts and stakeholders discussed emissions measurement approaches, ongoing research, GHGRP methodology, methane oxidation, and current literature. These discussions will dovetail with EPA's upcoming Landfill Methane Measurement Meeting ("Meeting") to be held at Research Triangle Park in October. As described by EPA, the Meeting will focus on the development of advanced methane monitoring technologies as applied to landfills, and a discussion of how these technologies may fit into a regulatory framework. EPA has invited technology developers, agencies, researchers, trade organizations, and other stakeholders to the Meeting. At the same time, the Solid Waste Industry for Climate Solutions ("SWICS") continues its work on an updated version of its white paper entitled, *Current MSW Industry Position and State-of-the-Practice on LFG Collection Efficiency, Methane Oxidation, and Carbon Sequestration in Landfills*, which is currently in academic review.

In light of the growing number of initiatives relating to quantifying emissions from MSW landfills, which are developing in real time, EPA has put the cart before the horse in adopting the Table HH-3 collection efficiencies and incorporating them directly into AP-42. It is evident that EPA agrees that more information is needed, as illustrated by its issuance of a Request for Information ("RFI") on August 29, 2024.[38] Specifically, EPA is requesting information on, *inter*

---

[38] *See Use of Advanced and Emerging Technologies for Quantification of Annual Facility Methane Emissions Under the Greenhouse Gas Reporting Program*, 89 Fed. Reg. 70177 (Aug. 29, 2024).

2915468_6

*alia*, issues related to the quantification of methane emissions "using currently available advanced measurement technologies," including: (1) detection and quantification of methane emission rates; (2) approaches for extrapolating observation-based methane emission rates to estimate annual total emissions; and (3) approaches for quantifying annual total methane emissions for sources that emit at rates below technology minimum detection thresholds.[39] In issuing the RFI, EPA implicitly acknowledges that GHG quantification from MSW landfills is a developing, highly technical practice, that warrants careful consideration of various approaches, rather than applying universal limitations on the diverse array of landfills subject to emissions measurement regulations. Accordingly, EPA's RFI shows that EPA made a hasty decision to (1) apply across-the-board reductions in collection efficiency to all reporters in Table HH-3 of the Final GHGRP Rule, and (2) incorporate the reduced collection efficiencies into AP-42 Section 2.4.

By failing to consider the growing body of technical data, the incorporation of AP-42 across federal programs, and the inclusion of AP-42 into state permitting schemes, EPA has failed to consider several highly important aspects of the problem, rending its action arbitrary and capricious.

Moreover, by implementing the new collection efficiency values from Table HH-3, EPA has not offered an acceptable explanation that might establish a rational connection between the facts found and the choices made. In fact, EPA's *only* explanation states that the change was prompted by EIP's comment requesting EPA to implement portions of the GHGRP included in EPA's 2023 Supplemental Proposal. EPA explained that EIP's comment, and in turn, the

---

[39] *Id.* at 70179.

2915468_6

finalized version of subpart HH, were the foundations for its change.[40] In any event, on August 15, 2024, EPA incorporated the Table HH-3 collection efficiency values into the Final AP-42 Revision, despite having decided to reconsider the very same Table HH-3 collection efficiency values seven days earlier.[41] This decision, coupled with EPA's bareboned explanation, does not render the Final AP-42 Revision as "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).

### D. EPA acted without "observance of procedure required by law" required for rulemaking under the Clean Air Act.

Petitioner asserts herein that EPA's action in finalizing the Final AP-42 is a final action subject to review and reconsideration under Section 307 of the Clean Air Act. Although EPA's action bears many of the hallmarks of final action, as discussed *supra* in Section III, EPA failed to follow the procedural requirements of Section 307(d) of the Clean Air Act, including, *inter alia*, publication in the Federal Register, establishing a rulemaking docket, providing a summary of the factual data on which the proposal was based, providing a summary of the methodology used in obtaining and analyzing the data, and providing a summary of the major legal interpretations and policy considerations underlying the proposed rule. 42 U.S.C. ¶ 7607(d). For this reason, the Final AP-42 Revision suffers from procedural defects that render it unlawful and erroneous, and on that basis, Petitioner asks EPA to voluntarily rescind and reconsider the Final AP-42 Revision.

### V. Request for Administrative Stay

Section 307(d)(7)(8) of the Clean Air Act permits EPA to stay the effectiveness of that rule "for a period not to exceed three months" pending reconsideration. An administrative stay

---

[40] *See Response to Comments on Draft Revisions to AP-42 Chapter 2, Section 4 – Municipal Solid Waste Landfills August 2024*, at 11.
[41] *See* Attachment C.

2915468_6

gives the Agency time to reconsider its position and review the rule's requirements without imposing unnecessary compliance costs or burdens on regulated entities. EPA may also use a Section 307(d) stay to avoid any confusion in the regulated industry or implementing agencies that may arise from the Agency's promulgation then subsequent revision of its regulatory requirements. Staying the effective date of the rule until EPA completes its reconsideration process avoids any such regulatory whiplash. Here, Petitioner asks EPA to stay the effectiveness of the Final AP-42 Revision incorporation of the Table HH-3 collection efficiencies pending reconsideration. Such a stay would be appropriate, especially in light of EPA's decision to grant reconsideration of the Final GHGRP Rule on that same basis.

## VI.    **Request for Alternative Relief**

Petitioner acknowledges that the novel interplay among AP-42 emission factors, the Final GHGRP Rule and the unique nature of MSW landfills make this Petition procedurally complex and not the typical subject of a Clean Air Act petition for reconsideration. Petitioner preserves its position with respect to this issue, and indeed is contemporaneously filing a protective judicial petition in the D.C. Circuit on this basis. Petitioner is open to exploring other potential avenues with EPA to remedy the unfair surprise and peremptory imposition of reduced collection efficiencies upon MSW landfills via the Final AP-42 Revision, especially at a time where the knowledge and understanding of such issues is developing rapidly, is subject to EPA reconsideration, and is the subject of a currently pending RFI on which EPA is taking comment. In short, there is a fairness issue here that must be remedied. To the extent that EPA believes that the Final AP-42 Revision do not constitute final agency action, Petitioner urges EPA to simply revise AP-42 to remove the reference to Table HH-3 of the Final GHGRP Rule pending reconsideration thereof, and return to the prior version of AP-42 Section 2.4.4.2, which incorporated a range of collection efficiencies and a 75% default value.

34

## VII. **Conclusion**

Petitioner appreciates EPA's consideration of this petition, and is more than willing to work cooperatively with EPA to further discuss the items addressed herein.

2915468_6

# ATTACHMENT A

**Archived:** Monday, September 30, 2024 12:13:26 PM
**From:** Chief Info
**Mail received time:** Thu, 15 Aug 2024 16:12:51
**Sent:** Thu, 15 Aug 2024 16:09:30
**To:** Measurement Policy Group
**Subject:** [EXTERNAL] [chief] Final Emission Factors for AP-42 Chapter 2, Section 4 - Municipal Solid Waste Landfills
**Importance:** Normal
**Sensitivity:** None

---

EPA has finalized AP-42 Chapter 2, Section 4 - Municipal Solid Waste Landfills. The finalized factors, the comments received, the response to comments, a summary of changes made in the chapter from draft to final, and the final AP-42 section can be found at:

https://www.epa.gov/air-emissions-factors-and-quantification/final-emissions-factors-ap-42-chapter-2-section-4

```
ne----------------------------------------neYou are currently subscribed to chief as
: ABaniste@wm.comneneTo unsubscribe, send a blank email to leave-1954749-2619838.8b721
3516d743f397505cd483af71a7d@lists.epa.govneOR:neFor problems with this list, contact c
hief-Owner@lists.epa.govne----------------------------------------
```

# ATTACHMENT B



June 24, 2024

<u>Via Electronic Mail and Hand Delivery</u>

The Honorable Michael S. Regan      Gautam Srinivasan
Administrator      Associate General Counsel
U.S. Environmental Protection Agency      U.S. Environmental Protection Agency
Office of the Administrator      Air and Radiation Law Office
1200 Pennsylvania Avenue NW      1200 Pennsylvania Avenue NW
Washington, D.C. 20460      Washington, D.C. 20460
Regan.Michael@epa.gov      Srinivasan.gautam@epa.gov

      Re:     **Petition for Reconsideration: Greenhouse Gas Reporting Program Subpart HH, Municipal Solid Waste Landfills**

Dear Administrator Regan and Associate General Counsel Srinivasan:

      Enclosed please find attached a Petition for Reconsideration submitted by the National Waste & Recycling Association (NWRA) with respect to the rule entitled *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, <u>89 Fed. Reg. 31802</u> (April 25, 2024), docket No. EPA-HQ-OAR-2019-0424. NWRA's Petition for Reconsideration is limited to Subpart HH of the Greenhouse Gas Reporting Rule, which is applicable to Municipal Solid Waste Landfills, and EPA's determination therein to reduce default landfill gas collection efficiency values for reporters under the rule.

      NWRA appreciates EPA's consideration of this Petition and hopes to work cooperatively with EPA toward improvements in the accuracy of landfill sector emissions reporting. Please feel free to contact the undersigned at agermain@wasterecycling.org, or outside counsel for NWRA, Carol McCabe at cmccabe@mankogold.com or Matt Morrison at matthew.morrison@pillsburylaw.com, with any questions you may have.

      Respectfully submitted,

Anne Germain
Chief Operating Officer and Senior Vice President
of Technical and Regulatory Affairs
National Waste & Recycling Association

Enclosure

cc: Jennifer Bohman, EPA Office of Atmospheric Programs (via electronic mail)
Julius Banks, EPA Greenhouse Gas Reporting Branch (via hand delivery)
Carol F. McCabe, Manko, Gold, Katcher & Fox (via electronic mail)
Kelly A. Hanna, Manko, Gold, Katcher & Fox (via electronic mail)
Matthew W. Morrison, Pillsbury, Winthrop, Shaw, Pittman (via electronic mail)
Steve R. Brenner, Pillsbury, Winthrop, Shaw, Pittman (via electronic mail)

**The National Waste & Recycling Association's**
**Petition for Reconsideration of The Final Rule:**
*Revisions and Confidentiality Determinations for Data Elements*
*Under the Greenhouse Gas Reporting Rule*,
**89 Fed. Reg. 31802 (April 25, 2024)**
**Docket No. EPA-HQ-OAR-2019-0424**

# Table of Contents

**Page**

I. Introduction ............................................................................................... 1

II. Background to the Final Rule ...................................................................... 3

    A. The Proposed Rules ............................................................................. 5

    B. Final Rule .............................................................................................. 9

III. Requested Reconsideration of the Collection Efficiency Values ........................................ 10

    A. EPA did not afford interested parties with adequate notice of the lowered collection efficiencies applicable to all Reporters; therefore, the Final Rule is not the "logical outgrowth" of the Proposed Rules. ................................. 11

    B. The finalized collection efficiencies should be reconsidered because the Petitioner's objections are of "central relevance to the outcome of the rule." ........... 19

    C. EPA lacks adequate technical justification for the finalized reduction in collection efficiencies. ............................................................................ 23

        1. The Nesser Study does not support EPA's collection efficiency determination. ........................................................................... 25

        2. The Duan Study does not support EPA's collection efficiency determination. ........................................................................... 28

        3. The EIP and Duren Studies do not support EPA's collection efficiency determination. ........................................................................... 30

        4. Other papers and emerging studies do not support EPA's reduction in collection efficiency determination. ........................................................ 34

IV. Basis for Relief and Proposed Next Steps ..................................................... 37

**PETITION FOR RECONSIDERATION TO THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

## I.    <u>Introduction</u>

On April 25, 2024, the United States Environmental Protection Agency ("EPA") finalized updates to the Greenhouse Gas Reporting Program rules ("GHGRP"), codified under Title 40, part 98 of the Code of Federal Regulations and effective January 1, 2025 ("Final Rule").[1] The Final Rule is a culmination of two Notices of Proposed Rulemakings: the Data Quality Improvement Proposal and the 2023 Supplemental Proposal.[2] In finalizing the respective changes across part 98, EPA articulated its two overarching goals: (1) improving the quality of data collected from municipal solid waste ("MSW") landfills; and (2) strengthening applicable reporting requirements. The Final Rule includes updates to subpart HH of the GHGRP, applicable to MSW landfills, including unanticipated changes to methane emissions calculation methodologies that form the subject of this Petition for Reconsideration.

Specifically, in the Final Rule, EPA unexpectedly reduced the collection efficiency values contained in Table HH-3 and applied in equations HH-7 and HH-8 to calculate methane emissions from MSW landfills subject to the GHGRP ("Reporters").[3] As proposed in the 2023 Supplement, the lowered collection efficiencies would have applied only to "non-regulated" Reporters who are not required to and opt not to conduct surface methane emissions monitoring ("SEM") under applicable federal rules. EPA proposed to retain the same, higher collection efficiencies applicable to "regulated" landfills that are required to, or opt to, conduct SEM.

---

[1] *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, <u>89 Fed. Reg. 31802</u> (April 25, 2024) ("Final Rule").

[2] *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, <u>87 Fed. Reg. 36920</u> (June 21, 2022) ("Data Quality Improvements Proposal"); *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule*, <u>88 Fed. Reg. 32852</u> (May 22, 2023) ("2023 Supplemental Proposal").

[3] 2023 Supplemental Proposal, <u>88 Fed. Reg. 32861</u>.

1

Relatedly, EPA proposed to impose a new "correction term" within equations HH-6, HH-7, and HH-8 for landfills conducting SEM to adjust emissions values based on the number of locations with concentration above 500 parts per million above background identified during surface measurement periods. Taken together, EPA's proposal expressly coupled collection efficiency adjustments with SEM practices. In its Final Rule, however, EPA took an impermissible and unanticipated U-turn, decoupling collection efficiency from SEM and site-specific performance measures and imposing significantly reduced collection efficiencies across all Reporters, without adequate prelude or justification. Moreover, by requiring Reporters to apply a reduced collection efficiency irrespective of whether they are conducting SEM, EPA is effectively requiring the majority of Reporters to overstate their greenhouse gas emissions. These changes do nothing to achieve EPA's two stated goals of improving data quality and strengthening reporting requirements.

The Petitioner is the National Waste & Recycling Association ("NWRA" or "the Petitioner"). NWRA is the leading voice of the North American waste and recycling industry on advocacy, education, and safety. The industry provides essential services that benefit our local communities and businesses by assisting our customers in achieving their environmental and sustainability aspirations. NWRA supports and promotes regulatory advancements and policies that benefit the solid waste industry and improve the quality of life for all Americans. Association members operate in all 50 states and the District of Columbia and can be found in most, if not all, U.S. congressional districts. Waste and recycling facilities number nearly 18,000 scattered throughout the U.S., mirroring population centers. Our nearly 700 members are a mix of publicly traded and privately owned local, regional and Fortune 500 national and international

companies. NWRA represents approximately 70 percent of the private sector waste and recycling market.

Members of NWRA are directly and adversely affected by EPA's promulgation of the Final Rule, which cannot plausibly be considered the logical outgrowth of the 2023 Supplemental Proposal. NWRA and other interested parties were not afforded adequate notice of EPA's ultimate decision to reduce existing collection efficiencies identified in subpart HH of the GHGRP for all landfills, irrespective of whether a landfill was conducting SEM. While NWRA shares EPA's stated objective of ensuring accurate quantification and reporting of greenhouse gas emissions, the Agency's finalized approach undermines that shared objective by adopting a methodology that will overestimate methane emissions, despite an abundance of scientific evidence that more closely aligns with EPA's proposed approach to base emission estimates on site-specific factors like SEM. The Final Rule will also cause reporting under the GHGRP to be at odds with other federal reporting and permitting programs, as well as the landfill sector's established practices regarding sustainability and GHG reporting.

Since EPA's decision to lower collection efficiencies in subpart HH of the Final Rule is procedurally flawed and substantively unwarranted, NWRA respectfully requests that EPA reconsider this important aspect of subpart HH of the Final Rule.[4]

## II.   **Background to the Final Rule**

In its Fiscal Year 2008 Consolidated Appropriations Act,[5] Congress directed EPA to promulgate regulations requiring "mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the United States."[6] Congress articulated,

---

[4] NWRA has also filed a petition for judicial review of the Final Rule in the United States Court of Appeals for the District of Columbia Circuit.
[5] 121 Stat. 1844, Pub. Law 110-116 (Dec. 26, 2007).
[6] Id. at 2128.

in light of the "growing scientific consensus" that humans were contributing to the accumulation of greenhouse gases in the atmosphere, leading to increased global temperatures, that a "comprehensive and effective national program of mandatory market-based limits and incentives on emissions of greenhouse gases" should be implemented to "slow, stop, and reverse" emissions in such a way which does not "significantly harm the United States economy."[7] Congress issued an accompanying joint statement directing EPA to use its existing authority under the federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*, to develop the mandatory greenhouse gas reporting rule.

In accordance with this Congressional directive, EPA finalized its first version of the GHGRP on October 30, 2009, utilizing its information-gathering authority under Section 114 of the Clean Air Act.[8] The original GHGRP Rule included MSW landfills that generated over 25,000 metric tons of carbon dioxide equivalent or more per year as a source category and was promulgated under Title 40 of the Code of Federal Regulations, part 98, subpart HH.[9]

Since 2009, the GHGRP has been updated numerous times.[10] On June 21, 2022, EPA published a Notice of Proposed Rulemaking ("NPRM") in the Federal Register proposing certain updates to the GHGRP, referred to as the Data Quality Improvements Proposal.[11] Thereafter, EPA issued another NPRM to supplement the Data Quality Improvements Proposal—the 2023 Supplement[12] (collectively, the "Proposed Rules")—once again seeking comment from interested parties regarding proposed changes geared toward improving the quality of data

---

[7] *Id.* at 2152.
[8] *Mandatory Reporting of Greenhouse Gases*, 74 Fed. Reg. 56260, 56264.
[9] *See id.* at 56267.
[10] *Rulemaking Notices for GHG Reporting*, EPA (last updated May 31, 2024), https://www.epa.gov/ghgreporting/rulemaking-notices-ghg-reporting.
[11] Data Quality Improvements Proposal, 87 Fed. Reg. 36920 (June 21, 2022).
[12] 2023 Supplemental Proposal, 88 Fed. Reg. 32852 (May 22, 2023).

collected from MSW landfills and strengthening reporting requirements. The 2023 Supplement included proposed changes to several methodologies within subpart HH used to calculate methane emissions from MSW landfills subject to the rule.

On April 25, 2024, EPA finalized its updates to the GHGRP, including changes to collection efficiency values in table HH-3. However, the finalized collection efficiencies differed starkly from those in the Proposed Rules, specifically the 2023 Supplement. Interested parties, including the Petitioner, were completely surprised by and unprepared for this change.

A.    **The Proposed Rules**

In the 2023 Supplemental Proposal, EPA proposed several changes to the GHGRP that it said would lead to more accurate emissions calculations, based on its conclusion that high emission events may be occurring where there is "a leaking cover system due to cracks, fissures, or gaps around protruding wells."[13] In order to address this concern, EPA proposed two ways in which collection efficiency or emission estimates would be adjusted, both related to SEM.  First, EPA proposed to amend Equations HH-6, HH-7, and HH-8 for regulated reporters (those that are subject to SEM requirements), by adding a "correction term." Equation HH-6 is used to calculate methane emissions using modeled methane generation and measured methane recovery, while equations HH-7 and HH-8 are used in tandem to calculate methane generation and emissions using methane recovery and estimated gas collection efficiency.[14] EPA noted that the three equations did not "directly account for periods where surface issues reduce the gas collection efficiency and/or reduce the fraction of methane oxidized."[15] To address that concern, EPA

---

[13] *Id.* at 32877–78. EPA also proposed other measures in the 2023 Supplemental Proposal to address a "poorly operating or non-operating gas collection system" and a "poorly operating or non-operating destruction device." NWRA commented on these proposed measures, which are not addressed in this petition.
[14] *See* 40 CFR 98.343(c)(3)(i).
[15] 2023 Supplemental Proposal, 88 Fed. Reg. 32878.

proposed a way to correct the estimated methane emissions based on monitored exceedances at the surface of the landfill. This proposed correction was based on conclusions from a study cited by EPA, *Heroux*, et al., and its internal citations, which suggested that methane "flux" (*i.e.*, the exchange of methane emissions and naturally occurring substances between Earth's surface and its atmosphere) is proportional to the measured methane concentration at six centimeters above the ground.[16] The proposed correction term would require Reporters subject to SEM to input the "leak duration days" (the number of days since the last monitoring event at the specified location) and the "surface methane concentration for the mth measurement that exceeds 500 parts per million above background."[17] The proposed correction term accounted for the fact that regulated landfills must record as a monitored exceedance, and take corrective action to address, any location with a reading of 500 ppm or more above background. EPA proposed to allow non-regulated landfills to elect to conduct SEM as well, so as to avail themselves of the use of the correction term when calculating their methane emissions using equations HH-6, HH-7, and HH-8.[18]

 The second method by which EPA considered an adjustment of collection efficiency based on SEM was a proposed adjustment to the gas collection efficiency values in Table HH-3, as utilized in equations HH-7 and HH-8, applicable *only* to landfills that are not required to conduct SEM under other federal provisions or decline to elect to conduct SEM pursuant to proposed 40 CFR § 98.346(g)(7).[19] Specifically, EPA proposed to include a new set of gas

---

[16] *Id.*

[17] *Id.* at 32931. "Regulated" landfills are subject to such SEM requirements under the NSPS program, 40 CFR part 60, WWW or XXX; the EG program, subparts Cc or Cf; or Federal plans, 40 CFR part 62, subparts GGG or OOO. *Id.* at 32877–78.

[18] *See id.* at 32932 (proposing to implement elective surface-emissions monitoring for landfills with landfill gas collection systems that are not required to conduct such under an existing federal program under a new subsection, 40 CFR § 98.346(g)(7)).

[19] *Id.* at 32879.

collection efficiency values in Table HH-3, applicable to landfills that do not conduct SEM, that are "10 percent lower than the current set of collection efficiencies."[20] EPA proposed that the current set of collection efficiencies would be retained, and would "only be applicable for landfills that are conducting [SEM] according to the landfills rule requirements." [21] Since the vast majority of landfills conduct surface emission monitoring,[22] EPA's proposal would have lowered the collection efficiencies for *only* a relatively small subset of Reporters.

EPA's proposal rested on the conclusions of a study by the Environmental Integrity Project ("EIP Study")[23] that collection efficiencies of non-regulated landfills were 20% lower, on average, than regulated landfills. In discussing the EIP study conclusion relating to SEM, EPA stated: "These results make sense because the objective of the surface methane concentration measurements are to ensure proper gas collection and non-regulated landfills that do not conduct these measurements would not necessarily have such checks in place and may be expected to have higher emissions."[24]  The EIP study results focused on a limited number of landfills in the state of Maryland that, when compared to the values reported under subpart HH, showed collection efficiencies that were 10% lower than regulated landfills under the GHGRP.

EPA specifically requested comment on: its proposal to lower collection efficiencies for landfills with gas collection systems that do not conduct SEM; the selection of a 10 percent collection efficiency reduction rather than the 20 percent reduction for those non-regulated landfills; and whether EPA should select an alternative value for non-regulated landfills based on

---

[20] *Id.*
[21] *Id.*
[22] EPA-HQ-OAR-2019-0424-0256, Attachment A.
[23] EIP, *Greenhouse Gas Emissions from Maryland's Landfills* (2021), https://environmentalintegrity.org/wp-content/uploads/2021/06/MD-Landfill-Methane-Report-6.9.2021-unembargoed_with-Attachments.pdf).
[24] 2023 Supplemental Proposal, 88 Fed. Reg. at 32878.

the supporting data.[25] NWRA provided comment with respect to these proposed changes.[26] In addition to comments noting the technical and substantive inadequacy of the EIP Study, NWRA also noted that EPA's proposal and reliance on the EIP Study failed to account for other major factors that are more influential with respect to collection efficiencies at regulated and non-regulated landfills, including federal requirements to provide comprehensive controls, meet prescriptive timelines, and limit system downtime. NWRA also incorporated by reference the comments of Morton Barlaz, who likewise noted that EPA failed to identify all the factors that can affect collection efficiency, such as the type of cover and well density.[27] NWRA further noted that the equation HH-8 methodology accounts for these differences already, obviating the need for reduced collection efficiencies as proposed.

NWRA also provided comment on the proposed correction term, asking EPA to consider other studies that show significant variability in the correlation between surface emissions exceedances and methane flux. Specifically, we noted that the *Heroux*, et al. study EPA used to support the purported correlation was conducted over 20 years ago based on data from a single landfill in Canada.

Importantly, NWRA asked that EPA delay the finalization of any of the proposed revisions to subpart HH until the Solid Waste Industry for Climate Solutions ("SWICS") finalized its revisions to the third version of its white paper entitled *Current MSW Industry Position and State-of-the-Practice on LFG Collection Efficiency, Methane Oxidation, and Carbon Sequestration in Landfills*. The SWICS White Paper is a compilation of peer-reviewed data and studies relating to a broad range of MSW landfills, and it was undertaken for the

---

[25] *Id.* at 32879.
[26] *See* EPA-HQ-OAR-2019-0424-0255.
[27] NWRA incorporated by reference the comments of Morton Barlaz. *See* EPA-HQ-OAR-2019-0424-0286.

express purpose of creating a methodology that would result in more accurate inventories of methane from landfills. In relevant part, NWRA noted that the SWICS paper will "move toward a more quantified basis for GCCS collection efficiency assessment….and a revisit on the current state-of-the-practice on collection efficiencies, oxidation, carbon storage, methane generation in landfills and destruction efficiencies."[28]

### B.   <u>Final Rule</u>

In the Final Rule, EPA stated that, "[f]ollowing the consideration of comments received, we are not taking final action on the surface-emissions monitoring correction term that was proposed. *Instead*, we are finalizing the proposed lower collection efficiencies in table HH-3 to subpart HH but applying the reduced collection efficiencies for *all* reporters under subpart HH."[29] In making this decision, EPA conceded, consistent with NWRA's comments, that the *Heroux*, et al. study was insufficient, alone, to support the implementation of the correction term, because it was over two decades old and focused on one landfill in Canada.[30] Upon review of the additional studies identified by commenters, including those identified by NWRA, EPA agreed that there was indeed significant variability in measured surface concentrations and methane emissions flux across different landfills.[31] Due to "high uncertainty," EPA indicated that it is reassessing the appropriateness of a correction term and "evaluating other direct measurement technologies for assessing more accurate, landfill-specific gas collection efficiencies."[32]

With respect to the proposed collection efficiencies, EPA concluded that it "expected that the surface emissions correction factor would result in lower emissions than those calculated

---

[28] *See* EPA-HQ-OAR-2019-0424-0255.
[29] Final Rule, <u>89 Fed. Reg. at 31853</u> (emphasis added).
[30] *Id.* at 31855.
[31] Final Rule, <u>89 Fed. Reg. at 31855</u>.
[32] *Id.*

9

using the 10-percentage point decrease in collection efficiency[.]"[33] Based on EPA's review of

other studies correlating surface methane concentrations with methane flux," EPA stated its

belief that a "more central tendency correlation factor is projected to yield emissions similar to a

10-percentage point decrease in collection efficiency."[34] EPA went on to state that "all the

measurement study data" reviewed suggests that current collection efficiencies are overstated on

average by 10-percentage points or more.[35] In making this point, EPA cited two studies that were

not included in either the preamble or the docket for the Proposed Rules: *Duan et al.*, 2022 and

*Nesser et al.*, 2023.[36] EPA asserted that the *Nesser* study, which observed 38 landfills subject to

SEM requirements, provides evidence that most observed landfills had lower or similar

measured collection efficiencies to those reported under subpart HH.[37] EPA further concluded

that "[s]imilar low average collection efficiencies were noted by *Duan* et al.," and that those

efficiencies justified its decision to finalize the lower default collection efficiencies for all

landfills.[38]

## III. <u>Requested Reconsideration of the Collection Efficiency Values</u>

Pursuant to Section 307(d)(7)(B) of the Clean Air Act, EPA "shall convene a proceeding

for reconsideration of [a] rule and provide the same procedural rights as would have been

afforded had this information been available at the time the rule was proposed" so long as the

party seeking reconsideration can demonstrate: (1) "that it was impracticable to raise such

---

[33] *Id.* at 31856.
[34] *Id.*
[35] *Id.*
[36] *Id.* (citing Duan, Z., et al., *Efficiency of gas collection systems at Danish landfills and implications for regulations*, 139 WASTE MANAGEMENT 269–78 (2022), https://doi.org/10.1016/j.wasman.2021.12.023.; Nesser, H., et al., *High-resolution U.S. methane emissions inferred from an inversion of 2019 TROPOMI satellite data: contributions from individual states, urban areas, and landfills*, EGUSPHERE [preprint] (2023), https://doi.org/10.5194/egusphere-2023-946; and supplement https://egusphere.copernicus.org/preprints/2023/egusphere-2023-946/egusphere-2023-946-supplement.pdf.
[37] Final Rule, <u>89 Fed. Reg. at 31856</u>.
[38] *Id.* at 31856.

objection" during the public comment period or that "the grounds for such objection arose after the period for public comment (but within the time specified for judicial review)"; and (2) "such objection is of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B).

The Petitioner could not practically raise procedural and substantive objections to EPA's finalization of Table HH-3's reduced collection efficiencies by 10 percentage points, applicable to *all* Reporters under subpart HH, because EPA did not afford adequate notice of this change to interested parties prior to the public comment period. As such, the change to collection efficiency in HH-3 applicable to all Reporters under the Final Rule is not the "logical outgrowth" of the Proposed Rules. EPA is required to convene proceedings for reconsideration, so that interested parties may raise relevant substantive objections that are of central relevance to the outcome of the rule.

### A. EPA did not afford interested parties with adequate notice of the lowered collection efficiencies applicable to all Reporters; therefore, the Final Rule is not the "logical outgrowth" of the Proposed Rules.

The practicability of raising an objection during the public comment period is dependent on EPA providing adequate notice of the changes it purports to finalize. The Clean Air Act incorporates the notice requirements set forth in the Administrative Procedure Act, by stipulating "[i]n the case of any federal rule to which this subsection applies, notice of a proposed rulemaking shall be published in the Federal Register, as provided under Section 553(b) of Title 5[.]" § 7607(b)(3). The APA's notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of America v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259

(D.C.Cir.2005). Notice, courts have recognized, must come from the agency's Notice of Proposed Rulemaking. *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 320 (D.C. Cir. 2020). Because agencies "do not quite have the prerogative of obscurantism reserved to the legislatures," they must adhere to a "high standard of articulation" in expressing the "data [of] critical degree" in their Notices of Proposed Rulemakings. *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977). Notice, therefore, cannot be "bootstrap[ped]" from a comment received during the comment period after a Notice of Proposed Rulemaking has been published. *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C.Cir.1991). In this respect, if agencies "fail[] to disclose to interested persons the factual material upon which the agency was relying," the elements of fairness which are "essential to any kind of administrative action" are vitiated by preventing agencies from submitting comments of "cogent materiality." *Nova Scotia*, 568 F.2d at 249, 252.

Moreover, without adequate notice, it is widely recognized that a final rule does not equate to the "logical outgrowth" of the proposal. *See, e.g.*, *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004); *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 648 (D.C. Cir. 2019) (stating that the "impracticability prong" of Section 307(d)(7)(B) covers "instances when the final rule was not a logical outgrowth of the proposed rule"). A final rule is the "logical outgrowth" of a proposed rule only if interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

In contrast, agencies cannot justify changes implemented in a final rule by placing an "unreasonable burden on commentors not only to identify errors in a proposed rule but also to

contemplate why every theoretical course of correction the agency might pursue would be inappropriate or incorrect." *Chesapeake Climate Action Network*, 952 F.3d at 320 (holding that a party's ability to comment on an *issue* generally does not in and of itself demonstrate sufficient notice from EPA). While an agency "need not subject every incremental change in its conclusions after each round of notice and comment to further public scrutiny before final action," *Sierra Club v. Costle*, 657 F.2d 298, 352 (D.C. Cir. 2981), interested parties must be able to anticipate that the change was possible, and could have submitted comments relating to such. *Northeast Md. Waste Disposal Auth.*, 358 F.3d at 952 (finding that a final rule which collapses the proposed rule's three categories into two is the logical outgrowth of the proposed rule); *Envt'l Integrity Project*, 425 F.3d at 996 ("The Court will refuse to all agencies to use the rulemaking process to pull a surprise switcheroo on the regulated entities.").

Here, the Petitioner did not have adequate notice of EPA's decision to impose lower collection efficiencies upon *all* Reporters. Rather, the Petitioner had notice that EPA was considering an adjustment to collection efficiencies and emission calculations tied to SEM practices; EPA indicated that it may lower collection efficiencies by 10% for those MSW landfills not conducting SEM and by a correction term for those that do conduct SEM and for which surface emissions were detected above defined thresholds. EPA did not indicate anywhere in the Proposed Rules that it was considering an across the board lowering of collection efficiencies regardless of SEM practices and results. Indeed, the very basis for EPA's proposal in the first instance was a concern about accurately accounting for "methane emissions from large release events that are currently not quantified under the GHGRP" including those that may result from "emissions from leaking cover systems due to cracks, fissures, or gaps around

protruding wells"[39]—issues that would be detectable by SEM. EPA's decision in the Final Rule had nothing to do with SEM at all—in fact, as discussed above, EPA pivoted away from SEM and in its place adopted an across-the-board reduction in collection efficiencies based in large part on newly identified data.

While it is true that EPA is not obligated, and cannot be reasonably expected, to subject "every incremental change in its conclusions" to additional rounds of notice and comment before final action, this change is not incremental. *See Sierra Club*, 657 F.2d at 352. The Petitioner could not and did not anticipate EPA's final action, especially given that EPA requested comment regarding: (1) the "new set of proposed collection efficiencies for landfills with gas collection systems that do not conduct surface methane concentration measurements"; (2) EPAs "selection of 10 percent lower collection efficiencies for landfills that are not monitored for surface methane rather than selecting a 20 percent lower value as suggested by the commenters that referenced the [EIP Study] data"[40]; and (3) supporting data on whether EPA should select an "alternative collection efficiency value than the proposed 10 percent difference or the 20 percent difference[.]"[41] Based on these requests for comment, the Petitioner reasonably expected EPA to: finalize the collection efficiencies as proposed for non-regulated Reporters; lower the values applicable to non-regulated Reporters in accordance with the percentages identified in the EIP Study; retain the status quo; or, if commenters pointed to scientific data that supported some "alternative" value for non-regulated landfills, subject interested parties to another round and notice and comment on a different proposed value based on the new scientific data. *See United*

---

[39] 2023 Supplemental Proposal, 88 Fed. Reg. at 32877–78.
[40] *Id.* at 32878; EIP, *Greenhouse Gas Emissions from Maryland's Landfills* (2021), https://environmentalintegrity.org/wp-content/uploads/2021/06/MD-Landfill-Methane-Report-6.9.2021-unembargoed_with-Attachments.pdf).
[41] 2023 Supplemental Proposal, 88 Fed. Reg. at 32879.

*States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977). In no event did EPA suggest that it was evaluating a collection efficiency reduction for all Reporters as a standalone measure, uncoupled from SEM as a factor on which that value should be based.

NWRA submitted comments in accordance with EPA's requests, in part because we disagree that SEM is a strong indicator of overall collection efficiency, especially as extrapolated to a quantification of annualized emissions. Further, NWRA disagreed with the technical information proffered by EPA to support its proposal. Specifically, the Petitioner's comments questioned the adequacy of the EIP Study on the basis that it was not properly peer-reviewed in accordance with EPA's General Assessment Factors[42] and Peer Review Policy.[43] NWRA also commented that the EIP Study, which focused on 14 landfills in Maryland only, was not representative of MSW landfills subject to subpart HH across the entire United States. In addition, NWRA pointed out that the equation HH-8 methodology, as-is, adequately accounts for the factors which legitimately and substantially influence the difference in collection efficiencies between landfills conducting SEM and landfills not conducting SEM. Accordingly, NWRA asked that EPA either maintain the status quo or await publication of comprehensive, representative data in the updated version of the SWICS White Paper, a document that EPA has relied upon in the past. NWRA's comments were also substantially influenced by the proposed "correction term," which EPA proposed in tandem with the lowered collection efficiencies. Though we objected to lowering collection efficiencies at all, we at least recognized that, coupled with the correction term, there existed an incentive for non-regulated landfills to conduct

---

[42] Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information (June 2003) (available at https://www.epa.gov/sites/default/files/2015-01/documents/assess2.pdf).
[43] Peer Review Handbook (4th Edition 2015) (available at https://www.epa.gov/sites/default/files/2020-08/documents/epa_peer_review_handbook_4th_edition.pdf).

SEM, consistent with the original goals articulated by Congress in directing EPA to establish the GHGRP.[44]

If the Petitioner had been on notice of the remote possibility that EPA would finalize lower collection efficiencies applicable to *all* Reporters, without regard to SEM, the Petitioner certainly would have submitted corresponding comments, outlining the broad range of scientific reasons why EPA should not do so. But since EPA failed to provide such notice, EPA's finalized collection efficiencies cannot permissibly be considered the "logical outgrowth" of its original proposal.

The situation here is unlike other cases in which the D.C. Circuit has found that the final rule was a "logical outgrowth" of a proposed rule. For example, in *Northeast Maryland Waste Disposal Authority v. EPA*, the Circuit Court held that a final rule which collapses the proposed rule's three categories into two *is* the logical outgrowth of the proposed rule. 358 F.3d 936, 953 (D.C. Cir. 2004). Rather, EPA's action here is akin to situations where the Circuit has found a lack of logical outgrowth. In *International Union*, for example, the agency's proposed rule provided that "[a] minimum air velocity of 300 feet per minute must be maintained" to ventilate underground coal mines.[45] The final rule, however, provided that "[t]he maximum air velocity in the belt entry must be no greater than 500 feet per minute, unless otherwise approved in the mine ventilation plan."[46] The D.C. Circuit vacated the final rule because, although "[t]here were some comments during the hearings urging the Secretary to set a maximum velocity cap," the Agency "did not afford a ... public notice of its intent to adopt, much less an opportunity to comment on, such a cap." *International Union*, 407 F.3d at 1261. Like the concept of air velocity in

---

[44] 121 Stat. 1844, Pub. L. 110-116 (Dec. 26, 2007).
[45] 68 Fed. Reg. 3936, 3965 (Jan. 27, 2003).
[46] 69 Fed. Reg. 17,480, 17,526 (Apr. 2, 2004).

*International Union*, the general concept of collection efficiency may have been raised in the 2023 Supplement, but the Final Rule's across the board decrease in collection efficiencies for all landfills is not consistent with the Proposed Rules, nor was it foreseeable from the Proposed Rules. EPA's final action here "finds no roots in the agency's proposal," *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994), equating to an impermissible "surprise switcheroo." *Envt'l Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

EPA has attempted to support its collection efficiency "switcheroo" by citing two new scientific studies that allegedly support the lowering of collection efficiencies as applicable to *all* Reporters, without regard to SEM. Specifically, EPA states that "[a]ll the measurement study data [] reviewed suggests that current GHGRP collection efficiencies are overstated on average by 10-percentage points or more," citing *Duan et al.*, 2022[47] and *Nesser et al.*, 2023.[48] As explained below, neither these studies nor the EIP Study support EPA's final decision.

Further, from a notice standpoint, EPA did not cite to either the *Duan* or *Nesser* studies in the Proposed Rules. The *Nesser* study was advanced by the paper's co-author, Hannah Nesser, in her comment in response to EPA's 2023 Supplement.[49] The paper itself was published online on June 13, 2023, only a few weeks before the close of the public comment period on July 22, 2023. The information contained therein was not even publicly available so as to inform EPA's proposals advanced on May 22, 2023, in the 2023 Supplement. In relying on entirely new data within the *Nesser* paper, EPA attempts to impermissibly "bootstrap" notice from a comment. *See*

---

[47] Duan, Z., et al., *Efficiency of gas collection systems at Danish landfills and implications for regulations*. 139 WASTE MANAGEMENT 269–78 (2022), https://doi.org/10.1016/j.wasman.2021.12.023.
[48] Nesser, H., et al., *High-resolution U.S. methane emissions inferred from an inversion of 2019 TROPOMI satellite data: contributions from individual states, urban areas, and landfills*. EGUSPHERE [preprint] (2023), https://doi.org/10.5194/egusphere-2023-946.
[49] EPA-HQ-OAR-2019-0424-0306. The paper was published online on June 13, 2023, only a few weeks before the close of the public comment period on July 22, 2023.

*Fertilizer Inst. V. EPA*, 935 F.2d 1303, 1312 (D.C.Cir.1991). EPA cannot reasonably assert that the final collection efficiencies are the "logical outgrowth" of the 2023 Supplement by relying on a study introduced via comment, without providing other interested parties the opportunity to review and comment on the study as well, for the purpose for which it is offered. *See, e.g.*, *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977).

Even more unacceptable is EPA's reliance on the *Duan* study. EPA did not cite or refer to *Duan* in either proposed rule; nor was it cited by an interested party during the public comment process. EPA's sudden reliance on *Duan* appears to be a post-hoc rationalization for its Final Rule, rather than appropriately identified support for a proposal that was properly noticed. Indeed, in this rulemaking, EPA has expressly acknowledged that newly cited studies introduced during the comment period warrant the agency's further consideration. As described *supra*, EPA proposed to implement a "correction term" to equations HH-7 and HH-8 that it hoped would more accurately quantify emissions by "account[ing] for periods where surface issues reduce the gas collection efficiency and/or reduce the fraction of methane oxidized."[50] In NWRA's comments on the proposal, we objected to the addition of the correction term on the basis that EPA's cited sources, namely *Heroux, et al.* and its internal sources, do not "adequately capture the complexity of the attempted correlation between surface emission exceedances and methane flux."[51] We asked that EPA consider other studies which show significant variability in the alleged correlation. In response, EPA stated that it would "continue to review additional information on existing and advanced methodologies and new literature studies and consider ways to effectively incorporate these methods and data in future revisions under subpart HH[.]"[52]

---

[50] 2023 Supplemental Proposal, 88 Fed. Reg. at 32878.
[51] EPA-HQ-OAR-2019-0424-0319.
[52] Final Rule, 89 Fed. Reg. at 31855.

EPA also indicated that it would take time to further consider the implementation of a correction term in light of newly advanced data, without taking any action in the Final Rule.[53] Consistent with its response to comments on the correction term, EPA should have acknowledged that more study of collection efficiency values is needed and should have subjected the 10-percent across-the board reduction collection efficiencies to an additional round of notice-and comment. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 554 (D.C. Cir. 2015) (EPA may determine that affording a party seeking reconsideration the "same procedural rights" requires the initiation of rulemaking to gather additional data" to inform its decision).

### B.     The finalized collection efficiencies should be reconsidered because the Petitioner's objections are of "central relevance to the outcome of the rule."

An objection is of central relevance if it "provides substantial support for the argument that the regulation should be revised." *Coal. For Responsible Regulation v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012);  *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982) ("Because the reasonableness and accuracy of the forecast data is critical to whether a smelter can qualify for [a nonferrous smelter order], Asarco and Magma's objections to that data, if well-founded, would clearly have been "'of central relevance.'").

The finalized collection efficiencies should be reevaluated and revised because they were central to the proposed and Final Rules. Indeed, emissions calculations are the crux of the GHGRP. EPA has articulated its over-arching goal to increase the accuracy of emissions calculations, so that Reporters, and more broadly the public at large, can understand whether and to what extent an entity is contributing to greenhouse gas emissions.[54] Universal required

---

[53] *Id.*
[54] Final Rule, 89 Fed. Reg. at 31884 ("[T]ransparent, standardized public data on emissions allows for accountability of polluters to the public who bear the cost of the pollution. The GHGRP serves as a powerful data resource and provides a critical tool for communities to identify nearby sources of GHGs and provide information to state and local governments.").

changes in calculation methodologies, therefore, should be considered carefully by EPA, especially where it has added a new methodology that overestimates emissions across the reporting sector. At a minimum, the "central relevance" requirement for reconsideration is satisfied in circumstances such as this, where there are well-founded objections pertaining to "critical" portions of the rule. *See Kennecott*, 684 F.2d at 1019.

Indeed, EPA's finalization of understated collection efficiencies, and the lack of support thereof, undermine the very purpose and objective of the GHGRP—to promote the accurate and comprehensive collection and reporting of greenhouse gas emission data. These failures will, in turn, harm the Petitioner's members. The finalized collection efficiencies will result in discrepancies among state and federal programs that require methane emissions reporting. With respect to federal programs, EPA has used GHGRP data on MSW landfills to "inform the development of the 2016 NSPS and EG for landfills." [55] Similarly, the "benefits of improved reporting also include enhancing existing voluntary programs, such as the Landfill Methane Outreach Program (LMOP)."[56] Moreover, EPA recognizes that "[s]everal states use GHGRP data to inform their own policymaking."[57] GHGRP emission estimates will also be at odds with EPA's own emissions factors in AP-42, as well as state permitting programs, which allow for a range of collection efficiencies and the recognition that higher collection efficiencies may be achieved at some sites that are designed and engineered to collect and control landfill gas.[58]

---

[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *See* AP-42, at 2.4-6, https://www3.epa.gov/ttnchie1/ap42/ch02/final/c02s04.pdf
    "To estimate controlled emissions of CH4, NMOC, and other constituents in landfill gas, the collection efficiency of the system must first be estimated. Reported collection efficiencies typically range from 60 to 85 percent, with an average of 75 percent most commonly assumed. Higher collection efficiencies may be achieved at some sites (i.e., those engineered to control gas emissions). If site-specific collection efficiencies are available (i.e., through a comprehensive surface sampling program), then they should be used instead of the 75 percent average."

Without accuracy and consistency across these programs, Reporters and agencies will not be able to appropriately identify and address emissions-related issues at affected facilities.

To the extent that GHGRP reported emissions are overestimated compared to reported emissions under other programs, such discrepancies will also add complexity to sustainability reporting and permitting, negatively impacting and complicating information provided to shareholders and third parties, and subjecting Reporters to risk. As a practical matter, the lowered collection efficiencies will have a compounding effect across multi-facility companies and may act as a disincentive to increase gas collection given that EPA's final rule now assumes inefficiencies among Reporters using HH-8. This is because HH-8, in general, assumes that emissions are directly proportional to the amount of landfill gas that is recovered and destroyed. Thus, the lowered collection efficiencies in the new rule could disincentivize higher actual collection.

Moreover, absent reconsideration, the final rule may have broad unintended consequences on policies designed to reduce greenhouse gas emissions. EPA's Renewable Fuel Standard ("RFS") program, for example, requires gasoline and diesel producers to incorporate renewable fuels into the Nation's transportation fuel supply.[59] Congress sought to accomplish this mandate in large part by encouraging the increased production and use of cellulosic biofuels—including renewable natural gas derived from landfill biogas—with the goal of achieving lower costs for consumers, reduced GHG emissions, better air quality, and greater energy independence.[60] Other policies have built upon the success of the RFS program, offering

---

[59] *See* <u>40 C.F.R. § 80</u>, subpart M.

[60] *Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes*, <u>88 Fed. Reg. 44468</u>, 44471 (July 12, 2023).

additional incentives for landfill methane capture, which waste sector stakeholders rely on in making business decisions around the installation of bio gas processing equipment.

States such as California, Oregon, Washington, and New Mexico have also developed Clean Fuel Standard programs[61] to encourage the use of low-carbon transportation fuels by providing credit to renewable fuel producers on a sliding scale based on the carbon intensity of each fuel. Unfortunately, the finalized collection efficiencies will have a negative impact on the carbon intensity scores of fuels sourced from landfill-derived biogas, resulting in reduced financial incentives for the production of renewable natural gas and potentially disincentivizing projects aimed at capturing methane emissions from waste sector operations. Congress has similarly incentivized the implementation of clean energy projects under the Inflation Reduction Act of 2022 ("IRA")[62], making tax credits available to taxpayers using a "technology-neutral" approach. The IRA specifically included a suite of tax credits designed to reward renewable fuel producers for lowering the carbon intensity scores of their fuels.[63] Similar to the negative impacts of the final rule associated with the aforementioned Clean Fuel Standard programs, EPA's finalized collection efficiencies will reduce the value of various tax credits for the production or generation of renewable natural gas, clean hydrogen, renewable electricity, and sustainable aviation fuel—potentially resulting in lost opportunities to capture landfill methane for beneficial use. Finally, to the extent that future legislative actions would contemplate a "carbon tax" or similar financially based implications for greenhouse gas emissions, it is

---

[61] Cal. Code Regs. tit. 17, § 95480; Or. Admin. R. 340-253-0000; Wash. Rev. Code Ann. § 70A.535.005; New Mexico House Bill 41 (requiring the Environmental Improvement Board to promulgate regulations to initiate the program no later than July 1, 2026).
[62] 136 Stat. 1818, Pub. L. 117–169 (Aug. 16, 2022).
[63] *See* 26 U.S.C. § 6426.

imperative that the quantification of such emissions is reliable and accurate. EPA should set a high standard under the GHGRP for such accuracy.

C. **EPA lacks adequate technical justification for the finalized reduction in collection efficiencies.**

As finalized, the lowered collection efficiencies are technically unjustified, and the proffered bases do not support EPA's change in position.

An agency action is arbitrary and capricious if there does not exist a "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rational connection between the facts found and the choices made does not exist if, among other reasons, the agency failed to consider an important aspect of the problem or the agency offers an explanation for its decision that runs counter to the evidence. *Id.* Both shortcomings are present here. In the 2023 Supplement, EPA purported to address "methane emissions from large release events" and focused on whether landfills were using SEM to address "leaking cover systems due to cracks, fissures or gaps around protruding wells" as a basis on which to adjust collection efficiency.[64] But in the Final Rule, EPA dismissed SEM as a consideration and relied only on study papers, including two that were newly cited, to support an across the board reduction in collection efficiencies, rather than focusing on methane emissions from large release events as it did in the 2023 Supplemental Proposal. In so doing, EPA prevented comment that would have addressed overall collection efficiencies across the MSW landfill sector rather than emissions associated with large release events, including those that occur via cover problems that are addressed by SEM. Such material comments would have advanced arguments falling within the "relevant factors" that EPA is

---

[64] 2023 Supplemental Proposal, 88 Fed. Reg. at 32877–78.

required to consider before finalizing a regulation. Without consideration of such important input, EPA ignored "important aspects of the problem" relating to landfill collection efficiency and greenhouse gas emissions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While reviewing courts are generally deferential with respect to decisions involving agency expertise, *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023); *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 526 (3d Cir. 2013), agencies are forbidden from reaching "whatever conclusions [they] like" and defending such positions "with vague allusions to [their] own expertise." *Sierra Club v. EPA*, 972 F.3d 290 (3d Cir. 2020) ("Although EPA has offered vague allusions to the inability of unspecified plants to meet a lower standard, the agency has deprived us of the ability to review its decision by showing its work."). Put simply, an agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021). This was not.

In the Final Rule, EPA acted arbitrarily by relying on scientific data that was not presented in either of the Proposed Rules. Just as importantly, EPA also failed to adequately explain how the scientific conclusions of the studies on which it relied—which involved the use of remote sensing data to quantify landfill emissions—support the final collection efficiencies without regard to SEM. In fact, in the Final Rule EPA underscored the dangers of relying on such technologies at this juncture. There, EPA stated that it was "not taking final action at this time regarding the incorporation of other direct measurement technologies" such as satellite imaging, aerial measurements, vehicle mounted measurement or continuous sensor networks because "most top-down facility measurements are taken over limited durations (a few minutes to a few hours) typically during the daylight hours when specific meteorological conditions exist (*e.g.*, no cloud cover for satellites; specific atmospheric and wind speed ranges for aerial

measurements).”[65] EPA further recognized that these methods of measurement “may not be representative of the annual $CH_4$ emissions from a facility, given that many emissions are episodic.”[66] Consequently, EPA concluded, “[e]xtrapolating from limited measurements to an entire year therefore creates risk of either over or under counting actual emissions.”[67] In this respect, EPA’s decision to heavily rely upon *Nesser* and similar studies, whose findings are the result of satellite imaging, in supporting a broad-based and unqualified reduction in collection efficiency values, is puzzling. EPA makes no effort to explain this discrepancy in logic, which has resulted in a Final Rule that runs counter to the agency’s own findings.[68]

### 1. The Nesser Study does not support EPA’s collection efficiency determination.

EPA cites the *Nesser* study for the general proposition that “recent aerial studies indicate methane emissions from landfills may be considerably higher than bottom-up emissions reported under subpart HH for *some* landfills” and further notes that such higher emissions may be attributable to “poorly operating gas collection systems or destruction devices and leaking cover systems.” [69] But EPA fails entirely to explain how the *Nesser* study, which was based on its review of only 38 landfills, supports a broad-based collection efficiency reduction applicable to

---

[65] Final Rule, 89 Fed. Reg. at 31856.
[66] *Id.*
[67] *Id.*
[68] This petition focuses on the introduction of scientific data from Nesser, et al., 2023 and Duan et al., 2022. EPA also referenced two additional studies: Oonk, H., *Efficiency of landfill gas collection for methane emissions reduction*, 2 Greenhouse Gas Measurement and Management, 129–145 (2012) https://doi.org/10.1080/20430779.2012.730798; and Arcadis, *Quantifying Methane Abatement Efficiency at Three Municipal Solid Waste Landfills; Final Report*. Prepared for U.S. EPA, Office of Research and Development, Research Triangle Park, NC. EPA Report No. EPA/600/R–12/ 003. (Jan. 2012). https://nepis.epa.gov/Exe/ZyPDF.cgi/P100DGTB.PDF?Dockey=P100DGTB.PDF.
It is unclear whether EPA relies on these studies to support its assertion that historical collection efficiencies are overstated, because EPA fails to adequately explain the relevance of these studies and how they support the finalization of the lowered collection efficiencies. Final Rule, 89 Fed. Reg. at 31856.
[69] Final Rule, 89 Fed. Reg. at 31854 (emphasis added).

the more than 1,000 landfills[70] that are subject to reporting under the GHGRP.[71]  Just as critically, EPA does not explain the basis on which such collection efficiencies can be appropriately or accurately measured with satellite imagery—a key concern for the Petitioner.

The *Nesser* study uses 2019 satellite (TROPOMI) data at approximately 25 x 25 km resolution to estimate methane emissions for grid cells in the contiguous United States with 2012 reported methane emissions larger than 0.1 Mg /(km year).[72] *Nesser* alleges that landfill emissions are 51% higher than the Greenhouse Gas Inventory ("GHGI") indicates.[73] The study compared optimized emissions for 73 individual landfills to those reported under the GHGRP and alleges to have found a median 77% increase in emissions relative to reported values.[74] Of the 73 studied landfills, 38 of the facilities recovered gas and reported an average efficiency of 0.5 (0.33 – 0.54) compared to the reported average of 0.61.[75] However, the collection efficiency reported in the 2019 GHGI was either within or higher than the author's reported uncertainty range for 15 of the 38 landfills.[76] Moreover, the study found no correlation ($R2 = 0.00$) between GHGRP emissions and the landfill estimates. The correlation did not improve when considering only facilities that do or do not capture landfill gas.[77]  In summary, NWRA believes that the *Nesser* study introduces several uncertainties, which, taken separately or collectively, undermine its use as a basis for EPA's action:

- The range reported is not a credible (confidence) interval for the estimated emissions but is the range of the eight members of the ensemble. This range only accounts for

---

[70] EPA-HQ-OAR-2019-0424-0256, Attachment A.
[71] Final Rule, <u>89 Fed. Reg. at 31856</u>.
[72] *Nesser, et al.*, at 2, 4.
[73] *Id.* at 26.
[74] *Id.*
[75] *Id.* at 19.
[76] *Id.*
[77] *Id.*

the uncertainty introduced by the optimized boundary conditions, bias correction, and regularization factor, and does not account for the uncertainty in the measurements, transport model or and source attribution methods.

- Emission sources not included in the 2012 GHGI are not accounted for. The source aggregation approach assumes that the 2012 reported fractional sectoral contributions are correct in each 25 x 25 km grid cell.

- The study only quantified 70 of the 1297 landfills that reported to the GHGRP in 2019.

- Satellite data can only be collected during clear daytime conditions, so landfills in areas with snow or high cloud cover were less likely to be quantified. With a low (3%) success rate, TROPOMI data may be as few as 12 measurements over the course of a year for a given site, biased toward clear summertime conditions.

- The study does not discuss whether readings occurred during landfill operating hours.

- It is our understanding that TROPOMI is an open-source satellite in geosynchronous orbit, meaning that measurements are taken at the same time each day, thus failing to account for key differences in nighttime values. EPA's own work discusses that 99% of landfills have more negative temporal pressure during days compared to the rest of the time leading to overestimating methane emission. While not published, EPA should be aware of work done within its own agency regarding this topic.

Indeed, even the authors acknowledge the risks inherent in relying on such data: "[o]ur landfill attribution approach, which relies on a prior estimate from 2012, may therefore misallocate emissions to the Puente Hills Landfill instead of to co-located oil and gas

operations".[78] Further, the study goes on to say, "[c]ompared to TROPOMI, both the prior and posterior GEOS- Chem simulations produce similar coefficients of determination (R2) and root-mean-square errors (RMSEs)," indicating that using the authors' estimated emission rates fail to explain any additional variability in the satellite measurement compared with the 2012 reported values.[79]

By not accounting for all the sources of uncertainty in the model and measurements in the reported uncertainty range, the authors have failed to demonstrate that the difference between the observed and reported collection efficiencies is statistically significant. The variation in observed collection efficiencies and significant sources of uncertainty in the observations do not provide sufficient justification for a 10% reduction in collection efficiency across the board.

### 2. The Duan Study does not support EPA's collection efficiency determination.

EPA similarly fails to explain how the conclusions of the *Duan, et al.*, 2022 study support its decision to lower collection efficiencies and uncouple collection efficiency from SEM. In fact, the conclusions set forth in the *Duan* study more closely *support* EPA's 2023 Supplement proposal to tie collection efficiency to SEM.

The *Duan* study observed 23 Danish landfills using a tracer gas dispersion method.[80] Gas collection efficiencies were calculated by taking the collected methane gas and dividing it by the sum of collected methane, methane emitted into the atmosphere, methane oxidized in cover soil, methane migrated laterally, and methane stored in the landfill body.[81] As a result, the study concluded that Danish landfills, on average, have lower collection efficiencies than other

---

[78] *Id.*
[79] *Id.* at 13.
[80] Duan, Z., et al., *Efficiency of gas collection systems at Danish landfills and implications for regulations*, 139 WASTE MANAGEMENT 270 (2022), https://doi.org/10.1016/j.wasman.2021.12.023.
[81] *Id.*

countries, and suggested that such was the result of shallow wells, lack of gas collection in some areas, and low recovery due to minimal production.[82] The study based its conclusions on "whole-site methane," even when collection systems did not cover the site. Sites that had discontinuous GCCS operations had high collection efficiencies (94-95%) when the system ran, but lower collection efficiencies when the GCCS was turned off, leading to lower average collection efficiencies.[83]

Notably, the *Duan* study acknowledged the complexity associated with quantifying gas production, emissions, and collection efficiency.[84] The study stated, "[a]t landfills with well-designed liner and cover systems and aggressive gas collection approaches, efficiency can be as high as above 90%, as observed in previous studies (e.g. UK-J and Redwood landfills) based on whole-site emissions measurements."[85] Further, the study noted "[i]f gas collection has not been established in every cell at a landfill—for example, if no gas collection occurs at active cells—using average efficiency will underestimate the actual gas collection efficiency in closed cells."[86] Based upon the complexity of calculation and landfill-dependent factors, the study actually suggests coupling collection efficiency with SEM.[87] This acknowledgment better comports with EPA's proposal in the 2023 Supplement, rather than what was finalized in the Final Rule. In sum, the *Duan* study agrees that a one-size-fits-all approach is inappropriate when it comes to landfill collection efficiency—an implication that is directly at odds with EPA's decision to

---

[82] *Id.* at 277.

[83] *Id.* at 274.

[84] *Id.* at 275 ("Landfill gas production and emissions are determined by many factors, such as waste composition, waste age, disposed waste amount, landfill design and operation, lack meteorological conditions, etc."); *see also id.* at 276 ("Gas collection efficiency depends on the phase of the landfills, design, and management of the LFG collection system, the presence or type of top cover, etc.").

[85] *Id.* at 270.

[86] *Id.* at 276.

[87] *Id.* Specifically, it states that "surface methane concentration screening could be conducted to identify significant release points or areas, following which any identified major leaks should be repaired."

lower default collection efficiencies across the board. With little more than a few sentences supporting EPA's use of this study in the Final Rule, EPA has failed to establish a rational connection between *Duan* and lowered default collection efficiency values irrespective of SEM.

Further diminishing any justification for reliance on the *Duan* study is the fact that it pertains to Danish landfills that are not representative of landfills across the United States. EPA has agreed with NWRA's contention that the data the agency used to support the proposed correction term—which rested on an analysis conducted using a dynamic flux chamber covering a surface area of 0.2 m$^2$ over 20 years ago at one landfill in Canada—could not adequately support the proposal.[88] Similarly, here, EPA should not rely on a study evaluating Danish landfills, especially where the authors state that there are stark differences between U.S. and Danish landfills. Specifically, the study states that the "measured emissions normalized to the disposed waste mass and areas of the landfills in Denmark are *significantly* lower than" normalized emissions of U.S. landfills, which may be the result of Denmark's 1997 ban on landfilling organic waste.[89] Consequently, relying on the *Duan* study is unacceptable, especially in light of EPA's outward refusal to rely on studies not found to be "nationally representative" of MSW landfills.[90]

### 3. The EIP and Duren Studies do not support EPA's collection efficiency determination.

Although EPA cites to both the EIP Study and the *Duren et al.*, 2019[91] study in the 2023 Supplement, EPA fails to adequately explain how either of these studies support its decision to

---

[88] Final Rule, <u>89 Fed. Reg. at 31855</u>.
[89] *Duan et al.*, at 276.
[90] Data Quality Improvements Proposal, <u>87 Fed. Reg. at 37009</u>.
[91] Duren et al., *California's Super Emitters*. 575 NATURE 180¬84. 7 (2019), https://doi.org/10.1038/s41586-019-1720-3.

lower collection efficiencies by 10% across all categories of affected landfills. As such, EPA's decision, which relies on these papers, is not supported.

EIP's findings rest on their discovery of a math error in the State of Maryland's methane emissions calculation for landfills. The study pointed out that the Maryland Department of the Environment calculated emissions as 10% of uncollected gases and 90% oxidized instead of 90% uncollected and 10% oxidized. From there, the study discussed how few landfills have gas collection and control systems—21 out of 40—with only four subject to federal requirements under the New Source Performance Standards program. EIP ultimately suggests two solutions: (1) more widespread implementation of gas collection systems, and (2) organics diversion. It compares collection efficiencies of facilities with gas collection and control systems that are subject to NSPS (76% collection efficiency) and those that voluntarily install such systems (55% collection efficiency): "EPA estimates that the average collection system harnesses 75% of the gas generated in the waste heap." However, EIP then notes that Maryland landfills have system collection efficiencies that range from 5-95%, with an average of 59%.

As stated in NWRA's comments to the 2023 Supplement, Maryland landfills are not representative of landfills across the United States and represent a low number of federally regulated landfills. Therefore, the data from this study should not be extrapolated to other landfills in the U.S. for comparing subpart HH collection efficiencies and LandGEM modeling-based collection efficiency. EPA exacerbated this misplaced reliance by failing to consider key variables in its analysis, including differences in waste disposal streams (and associated differences in potential methane generation capacity), calculation methodologies for collection efficiencies based on reported collection volumes, and the significance of federal expansion timelines and downtime limitations over the performance of SEM.

In addition, EPA failed to articulate a rational explanation with respect to how the study's conclusions support the across-the-board reductions in collection efficiencies seen in the Final Rule, and failed to address the concerns raised by NWRA in its comments. Ultimately, EPA went from using the EIP Study to support reduced collection efficiencies for facilities not conducting SEM, to reducing collection efficiencies for all Reporters regardless of SEM. Interestingly, EPA could not cite this study, or any other for that matter, to "support further reductions in gas collection efficiencies for voluntary gas collection systems."[92] Even in light of EPA's scientific and technical expertise, the use of the EIP Study to support the finalized changes is not "reasonable [or] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).

To the extent that EPA's finalized collection efficiencies were promulgated using conclusions from *Duren et al.*, 2019, such reliance is likewise misguided. The *Duren* study conducted five campaigns between 2016 through 2018 to survey more than 272,000 "infrastructure elements" in California using an airborne imaging spectrometer that the authors alleged "can rapidly map methane plumes."[93] However, the *Duren* study conceded "[t]he fact that we did not detect a larger population of smaller methane point sources across the landfill sector suggests that most of those facilities emit methane as area sources that cannot be detected with this method."[94] EPA similarly acknowledged this shortcoming in its Technical Support Memo:

> *It is important to note that only landfills with anomalous emissions could be quantified by the aerial methods used by Duren, et. al., (2019) and that these emissions only occurred at 7 percent of the surveyed landfills. However, when these anomalous emissions occur, the CH4 emissions reported to the EPA under Subpart HH are consistently lower than the measured emission rates extrapolated to annual*

---

[92] Final Rule, 89 Fed. Reg. at 31856.
[93] *Duren, et al.*, at 180.
[94] *Id.* at 182.

*estimates……… Because the California aerial study of Duren, et. al., (2019) could not quantify the emissions from 93% of the landfills that did not have anomalous emissions, this study does not provide evidence that the Subpart HH methodologies are inaccurate or unbiased under typical conditions that exist for most landfills.*[95]

The *Duren* study also failed to discuss diurnal issues or times of flights (*e.g.*, whether flights were conducted during the daylight hours), and it relied on a "persistence" factor that is inappropriate for multiple reasons. In this original publication, *Duren* gave landfills a blanket "100%" persistence factor, meaning that it extrapolated estimated emissions results to the entire year, which EPA has recognized as inappropriate.[96] Moreover, use of this persistence factor is inappropriate because the authors filtered their runs to weed out flights where they didn't get a detection, or the detection was unreliable for various QA/QC reasons.

Further, the *Duren* study never addresses whether the same plume may have been detected on multiple flyovers. This information is important, because it could either exaggerate or undermine the 100% persistence concept that is fundamental to emission quantification based on such remote observations. For example, different plumes would have different calculated emissions, with no one plume being appropriate for extrapolation. Further, the reality of variable emissions points reflect the variable nature of emissions over time. Assuming continuous emissions could easily overlook low- or even no-emissions days, in direct conflict with the notion of "100% persistence."

As another example, *Duren*'s methodology for calibrating wind data also relies on the work done by others in the Four Corners region, which is a very flat, desert type area that is inappropriate for other types of topography, including the canyon-topography landfills located in

---

[95] EPA-HQ-OAR-2019-0424-0256 Technical Support for Supplemental Revisions to subpart HH; Municipal Solid Waste Landfills, at 3.
[96] *See discussion supra* in Section II.C.1.

California. These calculations are highly sensitive to accurate wind modeling, making *Duren*'s use of a wide geographic NOAA data area questionable. In particular, *Duren's* approach was to use NOAA data, and subdivide the area around the landfill into 3 km squares, averaging the 9 closest squares into the "average site windspeed and direction" and applying that to the detected concentrations.[97] But plumes are not formed in that manner in challenging topographical areas. As with the point above, more recent publications from *Duren* and others, as well as other industry presentations, recognize that canyon landfills are notoriously difficult from which to quantify emissions.

Like *Nesser*, which utilized satellite data to support its findings, the integrity of the aerial measurements collected in *Duren* cannot provide adequate support for the lowered collection efficiencies across the entire MSW landfill sector for the same reasons.[98]

4.    **Other papers and emerging studies do not support EPA's reduction in collection efficiency determination.**

EPA, industry participants, and third parties continue to actively assess the value of remote sensing techniques for landfill emission quantification. While there is great interest and optimism around this topic, specific conclusions around collection efficiency values are premature. For example, in its comments to the 2023 Supplemental Proposal, Carbon Mapper has pointed out that there is "no existing system to validate or revise GHGRP reporting" based on "observed emissions rates using remote sensing."[99] Instead, Carbon Mapper suggested an multi-tiered monitoring approach to validate reported annual emissions by using a system to quantify "total site-wide emission sources" using "high-frequency to continuous monitoring."[100]

---

[97] *Duren* et al., at 181.
[98] *See supra*, Section II.C.1.
[99] EPA-HQ-OAR-2019-0424-0324, at 5.
[100] *Id.* at 5.

In addition, in responding to EPA's stated concern in the 2023 Supplemental Proposal about large release events, Carbon Mapper recommended the use of site-specific data to aid in assessing these events to avoid double counting, including "construction periods and locations, type of GCCS and combustion devices, any use of automated well tuning, monitoring methods used (including non-regulatory, voluntary monitoring), and cover types used."[101]

To the extent that EPA intended to rely on top-down, direct measurement technologies to support the reduction in collection efficiencies, EPA improperly extrapolated data that, if collected on a continual basis, would tend to prove the opposite conclusion. For example, a study by *Cusworth*, et al. found that "[o]n average, aerial emission rates were a factor of 2.7 higher than GHGRP for all landfills and a factor 1.4 higher for landfills with 10+ unique overpasses. Consistent with this study, independent assessments of US emission inventories have indicated a needed 1.25 to 1.5 scaling of waste emissions to reconcile inventories with in situ ground-based measurements and coarse resolution satellite observations."[102]  These findings emphasize even the Nesser authors' direct acknowledgement that the average of more point-in-time observations for a single site tends to agree more closely with annual inventory estimates; providing evidence that there is not enough data to support the extrapolated claim that observations are more representative than annual inventory estimates. The recency of the *Cusworth* publication reinforces the imperative raised by the Petitioners in their comments: that EPA should wait to promulgate changes to subpart HH in anticipation of forthcoming data that will provide more appropriate support for comprehensive changes.

---

[101] *Id.* at 5.
[102] Cusworth, et al., *Quantifying methane emissions from United States landfills*. 383 Science 1499 (2024).

As discussed *supra* in Sections II.C.1 and II.C.2, remote sensing measurements using satellite and aircraft systems like TROPOMI and AVIRIS-NG, described in *Nesser*, et al., 2024 and *Duren*, et al., 2019, can only be made during daylight hours, causing landfill emission rates derived from these approaches to be biased high because the measurements are made during active landfilling operations and do not capture the period when the landfill is not receiving waste. Another study, *Delkash*, et al., 2022, used eddy covariance ("EC") measurements to assess diurnal variations in methane emissions and "showed that short-term tracer correlation method ("TCM") measurements conducted between 12:00 and 18:00 overestimate diurnal emissions estimated by the EC tower up to 73% at this site."[103]  The EC methodology is able to operate continuously to capture concentration measurements to support emissions estimates over longer durations in a wide range of meteorological conditions and atmospheric stability classes. The study reported significant diurnal variation in methane flux at one landfill where EC and TCM were deployed over three seasons, and found that daytime methane flux rates were up to 23 times higher than nighttime fluxes.[104] Moreover, the daily average of EC observations presented a lower estimated emission rate when compared to tracer correlation method observations, a methodology similar to that used in the *Duan*, et al., 2019 study. While the *Delkash* study included only one landfill, its findings point to the potential bias of relying on daytime only measurements to determine landfill emissions rates, particularly when those rates will then be compared to annual rates like the GHGRP.  The study, therefore, stands for the same conclusion articulated above: assessing the accuracy of the GHGRP modeled rates requires measurement methods that continuously monitor both point-source and diffuse emissions so as to better

---

[103] Delkash, et al., *Diurnal landfill methane flux patterns across different seasons at a landfill in Southeastern US*, 144 WASTE MANAGEMENT 76, 85 (2022).
[104] *Id.* at 76.

understand diurnal and seasonal variations to compare point-in-time observations to annual emissions inventory estimates.[105]

IV.    <u>**Basis for Relief and Proposed Next Steps**</u>

Overall, EPA does not articulate a rational connection between the scientific and technical evidence relating to landfill collection efficiency and the decision to stray from its proposal and apply a uniform approach to collection efficiency values uncoupled from SEM. While NWRA did not support the SEM-based approach advanced by the 2023 Supplemental Proposal for the reasons expressed in our comments, we acknowledge the importance of site-specific design and performance factors in assessing collection efficiency. EPA's Final Rule is the opposite of a site-specific approach, based on SEM or otherwise. We expected the Final Rule to be the logical outgrowth of the proposal to tie collection efficiency adjustments to SEM. We also recognized that the proposed coupling of collection efficiencies and SEM served as an incentive for "non-regulated" landfills to implement SEM to avail themselves of the higher collection efficiencies. Lowering collection efficiency regardless of SEM now may have an unintended effect—if Reporters know that they can never achieve greater than 85% efficiency in estimating emissions under the GHGRP, there is little incentive to increase efficiency. EPA's simple explanation that lowered collection efficiencies are warranted in light of the agency's review of "direct measurement data for landfills" leaves an unfillable gap in reasoning and logic, warranting reconsideration.

NWRA and its members recognize the importance of developing technologies and ongoing studies and analyses of direct measurements and remote sensing data. The MSW landfill sector is deeply engaged in this work, in partnership with EPA's Office of Air and Radiation as

---

[105] *Id.* at 85; *see also* Stark, et al., *Investigation of U.S. landfill GHG reporting program methane emission models*, 186 Waste Management, 86, 86, 91 (2024).

well as its Office of Research and Development, Carbon Mapper, GHG Sat, RMI and others. Through SWICS and company-specific data analyses, NWRA anticipates that it will have a substantial set of data to share with EPA in the very near term, after appropriate quality control and assessment is complete. The data will consist of direct measurements, correlated with site-specific SEM and operational conditions, and evaluations of resulting emission impacts. NWRA will share this data with EPA in the proposed reconsideration period to help inform EPA's perspective on collection efficiencies. Most importantly, to the extent that these advancements assist in the strengthening of emission quantification and information, and thereby provide avenues for improvements in methane capture, the GHGRP should be structured to acknowledge and account for such improvements. The Final Rule unfortunately has the opposite effect, by imposing reduced collection efficiencies across the board, based on overgeneralized and qualitative theories that do not support the determination that was made.

As set forth at length above, NWRA requests that EPA grant reconsideration of the reduced collection efficiencies set forth in Table HH-3 of the Final Rule. Interested parties were not afforded the opportunity to comment on EPA's finalized collection efficiencies because they were not a "logical outgrowth" of the Proposed Rules.

To the extent that EPA declines to grant reconsideration on the bases set forth in Section 307(d)(7)(B) of the Clean Air Act, the Petitioner asks that EPA treat this submittal as a petition for rulemaking under the Administrative Procedure Act, 5 U.S.C. § 553(e), which is a "procedural right." *Massachusetts v. EPA*, 415 F.3d 50, 53 (D.C. Cir. 2005) *rev'd and remanded on other grounds by* 549 U.S. 497, 527 (2007); *Friends of the Earth v. EPA*, 934 F. Supp.2d 40, 54 (D.D.C. 2013) ("EPA is required to respond to a citizen petition for rulemaking.").

Dated: June 24, 2024                Respectfully submitted,

_____
Anne Germain
Chief Operating Officer and Senior Vice President
of Technical and Regulatory Affairs
National Waste & Recycling Association

_____
Carol F. McCabe
Kelly A. Hanna
MANKO, GOLD, KATCHER & FOX
Three Bala Plaza East
Suite 700
Bala Cynwyd, PA 19004
Phone: 484-430-2304
Fax: 484-430-5711
cmccabe@mankogold.com
khanna@mankogold.com

_____
Matthew W. Morrison
Steve R. Brenner
PILLSBURY, WINTHROP, SHAW, PITTMAN
200 Seventeenth Street, NW
Washington, DC 20036
Phone: 202-663-8000
Fax: 202-663-8007
matthew.morrison@pillsburylaw.com
steve.brenner@pillsburylaw.com

*Counsel for Petitioner National Waste &
Recycling Association*

# ATTACHMENT C



## OFFICE OF ATMOSPHERIC PROTECTION

WASHINGTON, D.C. 20460

August 8, 2024

Ms. Anne Germain
Chief Operating Officer and Senior Vice President of
Technical and Regulatory Affairs
National Waste & Recycling Association
1550 Crystal Drive, Suite 804
Arlington, Virginia 22202

Dear Ms. Germain:

The U.S. Environmental Protection Agency (EPA) received the June 24, 2024, petition sent on behalf of National Waste & Recycling Association for reconsideration of the final rule, "Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule" (89 FR 31802, April 25, 2024).

The petition identified as grounds for reconsideration that the public was not afforded adequate notice of EPA's ultimate decision to reduce the collection efficiencies for all landfills, irrespective of whether the landfill was conducting surface emissions monitoring. The EPA grants reconsideration of the final rule on the issue raised in your petition.

If you have any questions, please contact Mr. Julius Banks, Supervisor of the Greenhouse Gas Reporting Branch, at (202) 564-0957 or banks.julius@epa.gov.

Sincerely,

SHARYN LIE

Digitally signed by
SHARYN LIE
Date: 2024.08.08
10:59:20 -04'00'

Sharyn Lie
Director
Climate Change Division
Office of Atmospheric Protection

cc: Carol F. McCabe and Kelly A. Hanna; Mako, Gold, Katcher & Fox
Matthew W. Morrison and Steve R. Brenner; Pillsbury, Winthrop, Shaw, Pittman

# ATTACHMENT D



(c)  Any positive pressure LFG collection and control equipment showing signs of damage, including but not limited to cracking, discoloration, or warpage, shall be monitored as soon as practical after discovery of damage.

(d) If equipment is divided into sections or groups for monitoring, the permittee shall provide the Department a description of each section or group and figures demonstrating the location of each section or group.

## IV.  RECORDKEEPING REQUIREMENTS.

### # 017    [25 Pa. Code §127.12b]
**Plan approval terms and conditions.**

(a) The permittee shall calculate and record the monthly and 12-month rolling average VOC emissions from ▮▮▮▮▮ ▮▮▮▮, using Department approved methods and the latest edition of AP-42 Chapter 2.4.

(b) The permittee shall monitor and record the average or maximum flow rate of landfill gas (scfm) collected from the Fairless landfill on a monthly basis.

### # 018    [25 Pa. Code §127.12b]
**Plan approval terms and conditions.**

[Additional authority for this permit condition is also derived from 40 CFR Sections 60.768(a); 60.768(b)(1); 60.768(d-e).]

(a) Pursuant to 40 CFR Section 60.768(a), the permittee shall keep for at least 5 years, up-to-date,  readily accessible, on-site records of the design report that triggered 40 CFR Section 60.762(b), the current amount of solid waste in-place, and the year-by-year waste acceptance rate. Off-site records may be maintained if they are retrievable within 4 hours.  Either paper copy or electronic formats are acceptable.

(b)  Pursuant to 40 CFR Section 60.768(b), the permittee shall keep up-to-date, readily accessible records for the life of the control equipment of the data listed below, as measured during the initial compliance determination.  Records of subsequent monitoring shall be maintained for a minimum of 5 years.  Records of the control device vendor specifications shall be maintained until removal.

   (i)   maximum expected gas generation flow rate calculated in accordance with 40 CFR Section 60.765 (a)(1), unless another method is approved by the Department; and

   (ii)   density of wells, horizontal collectors, surface collectors, or other gas extraction devices determined using the procedures specified in 40 CFR Section 60.769(a)(1).

(c) Pursuant to 40 CFR Section 60.768(d), the permittee shall keep for the life of the collection system an up-to-date, readily accessible plot map showing each existing and planned collector in the system and providing a unique identification location label for each collector.  The permittee shall also keep:

   (i)   up-to-date, readily accessible records of the installation date and location of all newly installed collectors; and

   (ii)    readily accessible documentation of the nature, date of deposition, amount and location of asbestos-containing or nondegradable waste excluded from collection, as well as any nonproductive areas excluded from production.

(d) Pursuant to 40 CFR Section 60.768(e)(1), the permittee shall keep, for at least 5 years, up-to-date, readily accessible records of all collection and control system exceedances of the operational standards in 40 CFR Section 60.763 for the landfill, the reading in the subsequent month, whether or not the second reading is an exceedance, and the location of each exceedance.

(e) Pursuant to 40 CFR Section 60.768 (e)(2), the permittee shall also keep records of each wellhead temperature monitoring value above 131 °F, each wellhead nitrogen level of 20 percent or higher and each wellhead oxgen level at or above 5 percent.

(f) Pursuant to 40 CFR Section 60.768(e)(3), (4) and (5), the permittee shall keep:

# ATTACHMENT E

## SECTION II - Specific Permit Terms

## 1.    F001 – Landfill Gas Emissions

| Parameter | Permit Condition Number | Limitations | | Compliance Emission Factor | Monitoring | |
|---|---|---|---|---|---|---|
| | | Short Term | Long Term | | Method | Interval |
| VOC Emissions from uncollected landfill gas | 1.1 | | 23.3 tons/yr | EPA's Landfill Gas Emissions Model (most current version), or AP-42 2.4 | Calculation | Every 5 years |
| Standards of Performance for Municipal Solid Waste Landfills | 1.2 | | | | NSPS Subpart WWW | As Defined |
| NSPS General Provisions | 1.3 | | | | Subject to NSPS General Provisions | |
| National Emission Standards for Hazardous Air Pollutants: MSW Landfills | 1.4 | | | | MACT Subpart AAAA | As Defined |

1.1    Emissions of Volatile Organic Compounds (VOC) and Hazardous Air Pollutants (HAPs) from the landfill shall not exceed the annual limits in the table above.  The uncollected landfill gas emissions shall be calculated during the first year of the operating permit term using EPA's Landfill Gas Emissions Model (Version 3.02 or the most current version of the model), or the calculation methods outlined in AP-42 2.4.  If the LandGEM model shows that emissions will decrease each year, the calculations shall be conducted every 5 years.  The VOC emissions shall be 39% of the total non-methane organic compound (NMOC) emission that is estimated by the model. (████████████████████, as modified under the provisions of Section I, Condition 1.3.)

The mass of non-degradable solid waste may be deducted from the total waste acceptance when calculating emissions if adequate documentation of the nature and amount of such wastes is maintained.  Adequate documentation shall include the waste characterization procedures and recordkeeping format used.  Exclusion of nondegradeable waste from the emissions calculations is subject to Division review and approval, and records shall be provided for Division inspection upon request.

The following parameters shall be used when calculating emissions to monitor compliance with the annual emission limits of this permit, unless other parameters are approved in advance by the Division.  Note that these parameters may not be acceptable for emission calculations associated with the federal New Source Performance Standards or Emission Guidelines.

## 2. E002 – Fugitive Landfill Gas Emissions

| Parameter | Permit Condition | Limitations | Compliance Emission Factor | Monitoring | |
|---|---|---|---|---|---|
| | | | | Method | Interval |
| VOC Emissions* | 2.1 | 10.0 tons/yr | EPA's Landfill Gas Emissions Model (Version 3.03 or most current version), or AP-42 2.4 | Calculation | Annually |
| CO Emissions* | | 1.0 tons/yr | | | |
| Hazardous Air Pollutant Emissions (HAPs) | | 8.0 tons/yr of any single HAP 20 tons/yr of total HAPs | | | |
| PCS Acceptance Determination | 2.2 | As Defined | | Recordkeeping/ Calculation | Monthly/ Annually |
| PCS Exposure Time | 2.3 | Cover by end of day | | Recordkeeping | See Condition 2.3 |
| Waste Acceptance | 2.4 | 500,000 tons/yr | | Recordkeeping, 12 month rolling total | Monthly |
| Design Capacity | 2.5 | 6,044,354 Mg | | See Condition 2.5 | |

*Landfill gas emissions are considered to be 75% point source and 25% fugitive. This VOC emissions identified here are the fugitive portion.

2.1 Emissions of Volatile Organic Compounds (VOC), Carbon Monoxide (CO), and Hazardous Air Pollutants (HAPs) from the landfill shall not exceed the annual limits in the table above. Landfill gas emissions are calculated annually, and monthly limits and calculations do not apply. The emissions shall be calculated by March 1st of each year using EPA's Landfill Gas Emissions Model (Version 3.03 or the most current version of the model). The calculation shall use the actual waste acceptance rates as described in Condition 2.4 and from previous years. (████████, as modified under the provisions of Section I, Condition 1.3 and Colorado Regulation No. 3, Part C, Section I.A.7 and Part C, Section III.B.7 ████████████████) The mass of non-degradable solid waste may be deducted from the total waste acceptance when calculating emissions if adequate documentation of the nature and amount of such wastes is maintained. Adequate documentation shall include the waste characterization procedures and recordkeeping format used. Exclusion of nondegradeable waste from the emissions calculations is subject to Division review and approval, and records shall be provided for Division inspection upon request. VOC, CO, and HAP emissions shall be calculated using the following equations:

$$VOC\left(\frac{tons}{year}\right) = NMOC\left(\frac{tons}{year}\right) \times C_{VOC}\left(\frac{VOC}{NMOC}\right) \times 25\%\left(\frac{Uncollected\ LFG}{Total\ LFG}\right)$$

Where:

NMOC = NMOC value obtained from Table 2.1 below
$C_{VOC}$ = VOC concentration in NMOC from Table 2.1 below

$$CO\left(\frac{tons}{year}\right) = CO_{LandGEM}\left(\frac{tons}{year}\right) \times 25\%\left(\frac{Uncollected\ LFG}{Total\ LFG}\right)$$

## SECTION II -  Specific Permit Terms

### 1.    S001 - Uncollected landfill gas

| Parameter | Permit Condition Number | Limitation | Compliance Emission Factor | Monitoring | |
|-----------|------------------------|------------|---------------------------|------------|---|
| | | | | Method | Interval |
| Emission Limits | 1.1 | VOC: 88.3 tons/year<br><br>CO: 9.0 tons/year | EPA Landfill Gas Estimation Model or EPA AP-42 2.4 | Recordkeeping & Calculation | Annual |
| PCS Acceptance Determination | 1.2 | | See PS Memo #12-01 | Recordkeeping/ Calculation | Monthly/ Annually |
| PCS Exposure Time | 1.3 | Cover by end of day | | Recordkeeping | See Condition 1.3 |
| Waste Acceptance | 1.4 | 780,079 tons/yr | | Recordkeeping | Monthly |
| Design Capacity | 1.5 | 20,615,777 Mg | | See Condition 1.5 | |

1.1    Emissions of Volatile Organic Compounds (VOC), and CO from the landfill shall not exceed the annual limits in the table above.  Landfill gas emissions are calculated annually, and monthly limits and calculations do not apply.  The emissions shall be calculated by March 1st of each year beginning in 2019 using EPA's Landfill Gas Emissions Model (Version 3.02 or the most current version of the model).  The calculation shall use the actual waste acceptance rates as described in Condition 1.4 and from previous years. (█████████████████████████, as modified under the provisions of Section I, Condition 1.3 and Colorado Regulation No. 3, Part C, Section I.A.7 and Part C, Section III.B.7 b█████████████████████████ █████████████████████████)  The mass of non-degradable solid waste may be deducted from the total waste acceptance when calculating emissions if adequate documentation of the nature and amount of such wastes is maintained.  Adequate documentation shall include the waste characterization procedures and recordkeeping format used.  Exclusion of nondegradeable waste from the emissions calculations is subject to Division review and approval, and records shall be provided for Division inspection upon request.

The following parameters shall be used when calculating emissions to monitor compliance with the annual emission limits of this permit, unless other parameters are approved in advance by the Division.  Note that these parameters may not be acceptable for emission calculations associated with the federal New Source Performance Standards or Emission Guidelines.

| Parameter | Small Quantities of PCS | Considerable Quantities of PCS |
|-----------|------------------------|-------------------------------|
| Methane Generation Rate Constant "k" | 0.02 or valid Tier 3 test result | 0.02  or valid Tier 3 test result |
| Methane Generation Potential "$L_o$" | 100 | 100 |
| NMOC (as hexane) | 956 ppmv or valid Tier II test result | 2420 ppmv or valid Tier II test result |
| Benzene | 1.9 ppmv | 11.1 ppmv |
| Toluene | 39 ppmv | 170 ppmv |
| VOC | 39% of NMOC | 85% of NMOC |

## SECTION II - Specific Permit Terms

## 1. S001 – Uncollected Landfill Gas

| Parameter | Permit Condition Number | Limitation | Compliance Emission Factor | Monitoring | |
|---|---|---|---|---|---|
| | | | | Method | Interval |
| Emission Limits | 1.1 | VOC: 90.8 tons/year  CO: 6.3 tons/year | EPA Landfill Gas Estimation Model or EPA AP-42 2.4 | Recordkeeping & Calculation | Annual |
| PCS Acceptance Determination | 1.2 | | See PS Memo #12-01 | Recordkeeping/ Calculation | Monthly/ Annually |
| PCS Exposure Time | 1.3 | Cover by end of day | | Recordkeeping | See Condition 1.3 |
| Waste Acceptance | 1.4 | 2,880,288 tons/year | | Recordkeeping | Monthly |
| Design Capacity | 1.5 | 44,405,343 Mg | | See Condition 1.5 | |

1.1 Emissions of Volatile Organic Compounds (VOC), and CO from the landfill surface shall not exceed the annual limits in the table above. Landfill gas emissions are calculated annually, and monthly limits and calculations do not apply. The emissions shall be calculated by March 1st of each year beginning in 2021 using EPA's Landfill Gas Emissions Model (Version 3.02 or the most current version of the model). The calculation shall use the actual waste acceptance rates as described in Condition 1.4 and from previous years. (███████████████, as modified under the provisions of Section I, Condition 1.3 and Colorado Regulation No. 3, Part C, Section I.A.7 and Part C, Section III.B.7 ████████████████████████████ )

The mass of non-degradable solid waste may be deducted from the total waste acceptance when calculating emissions if adequate documentation of the nature and amount of such wastes is maintained. Adequate documentation shall include the waste characterization procedures and recordkeeping format used. Exclusion of nondegradeable waste from the emissions calculations is subject to Division review and approval, and records shall be provided for Division inspection upon request.

The following parameters shall be used when calculating emissions to monitor compliance with the annual emission limits of this permit, unless other parameters are approved in advance by the Division. Note that these parameters may not be acceptable for emission calculations associated with the federal New Source Performance Standards or Emission Guidelines.

# ATTACHMENT F

## B. LIMITATIONS, MONITORING, AND REPORTING

| Condition Number | Conditions |
|---|---|
| | $HAP_{F2}$=HAP emissions from F2<br>$HAP_{CONC2}$=HAP emissions from CONC2<br>$HAP_{PF}$=HAP emissions from PF<br>$HAP_{TOX}$=HAP emissions from TOX<br><br>$$LFG_{gemerated} = \frac{LFG_{collected}}{CE}$$<br><br>Where:<br>$LFG_{generated}$=Landfill gas generated, $\frac{ft^3}{year}$<br>$LFG_{colleceted}$=Landfill gas collected from the control devices, $\frac{ft^3}{year}$<br>CE= Collection Efficiency of 75% from AP-42 Section 2.4.4.2<br><br><br>$$LFG_{fugitive} = LFG_{gemerated} - LFG_{collected}$$<br><br>Where:<br>$LFG_{fugitive}$=Landfill gas not collected by the control devices, $\frac{ft^3}{year}$<br>$LFG_{generated}$=Landfill gas generated, $\frac{ft^3}{year}$<br>$LFG_{colleceted}$=Landfill gas collected from the control devices, $\frac{ft^3}{year}$<br><br><br>$$HAP_{LFG\ fugitives}\left(\frac{tons}{month}\right)$$<br>$$= LFG_{fugitives} \times \left(\frac{m^3}{35.314667 ft^3}\right) \times \frac{1 year}{12\ months} \times \frac{HAP\ concentration}{1,000,000} \times HAP\ MW \times P \times R$$<br>$$\times T \times \frac{1000\ g}{kg} \times \frac{2.2\ lb}{kg} \times \frac{1\ ton}{2000\ lb}$$<br><br>Where:<br>   $LFG_{fugitive}$=Landfill gas not collected by the control devices, $\frac{ft^3}{year}$<br>   HAP Concentration=The concentration of the HAP in the gas stream from AP-42, Table 2.4-1 (ppmv)<br>   HAP MW=The molecular weight of the HAP in the gas stream from AP-42, Table 2.4-1 $\left(\frac{g}{mol}\right)$<br>   P=Pressure of 1 atm<br>   R=Gas constant $\frac{8.205\ E-05\ m^3 atm}{gmol\ K}$<br>   T=Temperature of 298K<br>   Conversion factors: 35.314667 ft³ per m³, 12 months per year, 1000 grams per kilogram, 2.2 pounds per kilogram, 2000 pounds per ton. |

| B. | LIMITATIONS, MONITORING, AND REPORTING |
|---|---|

| Condition Number | Conditions |
|---|---|

$$HAP_{control\ device}\left(\frac{tons}{month}\right)$$
$$= LFG_{control\ device} \times \left(\frac{m^3}{35.314667ft^3}\right) \times \frac{1year}{12\ months} \times \frac{HAP\ concentration}{1E6} \times HAP\ MW \times P$$
$$\times R \times T \times \frac{1000\ g}{kg} \times \frac{2.2\ lb}{kg} \times \frac{1\ ton}{2000\ lb} \times (1 - DE)$$

Where:

$LFG_{control\ devices}$= Landfill gas collected by each control device F1A, LES-1, CONC, F2, CONC2, PF, and TOX, $\frac{ft^3}{year}$

HAP Concentration=The concentration of the HAP in the gas stream from AP-42, Table 2.4-1 (ppmv)

HAP MW=The molecular weight of the HAP in the gas stream from AP-42, Table 2.4-1 $\left(\frac{g}{mol}\right)$

P=Pressure of 1 atm

R=Gas constant $\frac{8.205\ E-05\ m^3 atm}{gmol\ K}$

T=Temperature of 298K

DE=Destruction efficiency of 98% for halogenated compounds. 99.7% for non-halogenated compounds, and 0% for mercury compounds.

Conversion factors: 35.314667 ft³ per m³, 12 months per year, 1000 grams per kilogram, 2.2 pounds per kilogram, 2000 pounds per ton.

$$HCl_{control\ device}\left(\frac{tons}{month}\right)$$
$$= LFG_{control\ device} \times \left(\frac{m^3}{35.314667ft^3}\right) \times \frac{1year}{12\ months} \times \frac{HCl\ concentration}{1E6} \times HCl\ MW \times P$$
$$\times R \times T \times \frac{1000\ g}{kg} \times \frac{2.2\ lb}{kg} \times \frac{1\ ton}{2000\ lb} \times \left(\frac{N_{COL}}{100}\right) \times 1.03 \times \left(\frac{N_{CNT}}{100}\right)$$

Where:

$LFG_{control\ devices}$= Landfill gas collected by each control device F1A, LES-1, CONC, F2, CONC2, PF, and TOX, $\frac{ft^3}{year}$

HCl Concentration=The concentration of the HCl in the gas stream from AP-42, Table 2.4-1 (42 ppmv)

HCl MW=The molecular weight of the HAP in the gas stream from AP-42, Table 2.4-1 (35.453 g/mol)

P=Pressure of 1 atm

R=Gas constant $\frac{8.205\ E-05\ m^3 atm}{gmol\ K}$

T=Temperature of 298K

$N_{COL}$= Efficiency of the landfill gas collection system (100% since based on actual flowrate to the control device)

# ATTACHMENT G



c.   Collection devices may be connected to the collection header pipes below or above the landfill surface. The connector assembly shall include a positive closing throttle valve, any necessary seals and couplings, access couplings and at least one sampling port. The collection devices shall be constructed of PVC, HDPE, fiberglass, stainless steel, or other nonporous material of suitable thickness.

[40 CFR 60.759(b)(3)]

3.   Convey the landfill gases to a control system in compliance with Condition III.A.1.c through the collection header pipe(s). The gas mover equipment shall be sized to handle the maximum gas generation flow rate expected over the intended use period of the gas moving equipment using the following procedures:

[40 CFR 60.759(c)]

a.   For existing collection systems, the flow data shall be used to project the maximum flow rate. If no flow data exists, the procedures in Condition III.B.3.b shall be used.

[40 CFR 60.759(c)(1)]

b.   For new collection systems, the maximum flow rate shall be in accordance with Condition III.C.1.a.

[40 CFR 60.759(c)(2)]

C.   **Compliance Provisions**

1.   If the facility is required to install a collection and control system as provided in Section III.A; except as provided in Condition III.A.1.a.(2), the specified methods in Condition III.C.1.a through III.C.1.f shall be used to determine whether the gas collection system is in compliance with Condition III.A.1.b.

[40 CFR 60.755(a)]

a.   For the purposes of calculating the maximum expected gas generation flow rate from the landfill to determine compliance with Condition III.A.1.b.(1).(a), one of the following equations shall be used. The k and $L_o$ kinetic factors should be those published in the most recent Compilation of Air Pollution Emission Factors (AP-42) or other site specific values demonstrated to be appropriate and approved by the Director. If k has been determined as specified in a Tier 3 analysis (Section II.D), the value of k determined from the test shall be used. A value of no more than 15 years shall be used for the intended use period of the gas mover equipment. The active life of the landfill is the age of the landfill plus the estimated number of years until closure.

[40 CFR 60.755(a)(1)]

(1)   For sites with unknown year-to-year solid waste acceptance rate:

$$Q_m = 2L_oR(e^{-kc} - e^{-kt})$$

where

| | | |
|---|---|---|
| $Q_m$ | = | maximum expected gas generation flow rate, cubic meters per year |
| $L_o$ | = | methane generation potential, cubic meters per megagram solid waste |
| R | = | average annual acceptance rate, Mg/yr |